

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| CENTRAL LABORERS' PENSION FUND, Individually and on Behalf of all Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>SIRVA INC., BRIAN P. KELLEY, JOAN E. RYAN, JAMES W. ROGERS and RICHARD J. SCHNALL, )<br><br>Defendants. ) | 04C 7644<br><br>**NO.** JUDGE RONALD GUZMAN<br><br>MAGISTRATE JUDGE DENLOW<br><br>*JURY TRIAL DEMANDED* |

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of regulatory filings and reports, securities analyst reports and advisories about Sirva Inc., press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than defendants, who purchased or otherwise acquired Sirva, Inc. ("Sirva") securities between November 25, 2003 and November 9, 2004, inclusive (the "Class Period"), pursuant to the Exchange Act of 1934 (the "Exchange Act").

1—1

2.      Sirva is a Westmont-based company providing various relocation and related services to corporations, governments and consumers. Sirva operates in four segments: Relocation Solutions- North America; and Relocation Solutions- Europe and Asia Pacific, both providing a variety of relocation services, such as selling the homes of relocating employees, moving employees and purchasing new homes for employees. In 2003, relocation services in these two segments accounted for approximately 70% of Sirva's income from operations. Sirva's Network Services segment services truck drivers, fleet owners and agents both inside and outside of Sirva's network. In this capacity, Sirva provides insurance coverage for vehicle liability, occupational accident, physical damage, and inland marine insurance coverage. Network Services also provides fuel, cell phone, tire services, legal assistance and retirement programs to the members of the National Association of Independent Truckers, an association of independent contract truck drivers Sirva acquired in April 2002. Network Services accounted for approximately 29% of Sirva's income from operations in 2003. Sirva's Transportation Solutions provides inventory management solutions to coordinate a variety of services such as order fulfillment, project-specific delivery management, and the tracing of products through customers' supply chains. Transportation Solutions accounted for approximately 1% of Sirva's income from operations.

3.      Sirva commenced its initial public offering ("IPO") on November 25, 2003. On that date its IPO registration statement and incorporated prospectus (collectively, the "Prospectus") became effective and Sirva registered 21,052,632 shares of common stock. Of those shares, 13,513,514 were sold by the Company, while 7,539,118 were sold by selling stockholders, at an offering price of $18.50 per share. In addition, the selling stockholders granted the underwriters an

option to purchase up to 3,157,894 additional shares at the IPO price minus an underwriting discount.

4.     Certain of the selling stockholders were private investment firms whose principals served as Sirva directors at the time of the IPO. More specifically, defendants James W. Rogers and Richard J. Schnall were principals of Clayton, Dubilier & Rice, Inc., the manager of selling stockholders Clayton, Dubilier & Rice Fund V Limited Partnership (sold 4,523,203 shares in the Offering) and Clayton, Dubilier & Rice Fund VI Limited Partnership (sold 1,880,273 shares in the Offering.) Defendants Schnall and Rogers were also limited partners of CD&R Associates V Limited Partnership (the general partner of selling stockholder Clayton, Dubilier & Rice Fund V Limited Partnership), and CD&R Associates VI Limited Partnership (the General Partner of selling stockholder Clayton, Dubilier & Rice Fund VI Limited Partnership). Finally, defendants Schnall and Rogers were stockholders and directors of CD&R Investment Associates II, Inc. (the managing general partner of CD&R Associates V Limited Partnership) and CD&R Investment Associates VI, Inc. (the managing general partner of CD&R Associates VI Limited Partnership).  Moreover, the two selling stockholders sold an additional 15,022,831 shares of Sirva common stock in the Company's secondary offering (the "Secondary Offering") commenced June 10, 2004. Thus, defendants Schnall and Rogers had an indirect financial interest in the sale of a total of 21,426,307 Sirva shares sold in the Offering and Secondary Offering (as limited partners of the selling stockholders' general partners).

5.     In the Prospectus, defendants touted the Company's status as a "global industry leader," its "diverse and stable revenue base," "strong cash flow and low capital requirements" and an "infrastructure [that] can support significant growth without a proportional increase in

- 3 -

expenditures," as Sirva's "competitive strengths." Unbeknownst to investors, however, the Prospectus failed to disclose that Sirva's financial results were materially artificially inflated by the Company's inadequate and unreasonably low insurance and claims reserves. By materially under-reserving, Sirva understated its expenses thereby artificially inflating its reported earnings. In addition, by under-reserving, Sirva understated its liabilities and artificially inflated its reported shareholders' equity. The Prospectus was materially false and misleading, as it presented materially inflated financial results, in violation of Generally Accepted Accounting Principles ("GAAP"). In addition, contrary to representations in the Prospectus about Sirva's nimble, "asset-light" business model, the Company's operations, especially in Europe, were , in fact, asset-intensive and saddled with high fixed-costs.

6. Defendants continued to improperly misrepresent Sirva's financial results, by under-reserving, in press releases and SEC filings following the IPO, including in the prospectus filed in connection with Sirva's June 10, 2004 secondary offering (the "Secondary Prospectus").

7. It was not until November 9, 2004, nearly a year after the IPO, and not long after the Secondary Offering, that Sirva was forced to admit that its insurance reserves had been materially understated. On that date, Sirva announced, in a press release discussing its third quarter 2004 results, that it would take a $15.2 million charge to bolster its insurance reserves, which severely and negatively impacted its earnings. The situation had gotten so bad that, according to the press release, the Company would discontinue entire lines of its insurance business. In addition, the Company also reported poor results from its European operations.

8.     This disclosure caused Sirva's stock price to drop from $23.78 per share on November 9, 2004 to $17.95 per share on November 10, 1004, a one day drop of 24.5%, on unusually heavy trading volume.

9.     As detailed below, the Company's belated disclosures, made in the November 9, 2004 press release and a follow-up conference call, contradicted many of defendants' Class Period statements.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b), 78n(a) and (e), and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act. Defendant Sirva maintains its principal executive offices in this District, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District, and Sirva conducts business in this District.

13.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

*Plaintiff*

14.     Central Laborers Pension Fund, as set forth in its accompanying certification, incorporated by reference herein, purchased Sirva common stock during the Class Period and has been damaged thereby.

*Defendants*

15.     Sirva is organized under the laws of Delaware with its principal executive offices located at 700 Oakmont Lane, Westmont, Illinois 60559.

16.     Brian P. Kelley ("Kelley") was, at all relevant times, Sirva's Chief Executive Officer and President.

17.     Joan E. Ryan ("Ryan") was, at all relevant times, Sirva's Chief Financial Officer and Senior Vice President.

18.     James W. Rogers ("Rogers") was, at all relevant times, Sirva's Chairman of the Board and a director.

19.     Richard J. Schnall ("Schnall") was, at all relevant times, a director of Sirva.

20.     Kelley, Ryan, Rogers and Schnall are referred to herein as the "Individual Defendants."

21.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Sirva were privy to confidential and proprietary information concerning Sirva, its operations, finances, financial condition, present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Sirva, as discussed in detail below. Because of their positions with Sirva, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and

future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

22.     The Individual Defendants are liable as direct participants in, and as co-conspirators, with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Sirva's business.

23.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

24.     As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock was, and is, registered with the Securities and Exchange

Commission (the "SEC") pursuant to the Securities Act and Exchange Act, and was traded on the New York Stock Exchange and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Sirva's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Sirva's common stock would be based upon truthful and accurate information. The Individual Defendants misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of plaintiff and all persons and entities who purchased or otherwise acquired Sirva securities between November 25, 2003 and November 9, 2004, inclusive.

27. Excluded from the Class are defendants, the officers and/or directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

28. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Sirva had over 73 million shares of common stock outstanding that were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sirva or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

30. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period, misrepresented material facts about the business, operations and financial statements of Sirva; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Materially False and Misleading Statements Disseminated During the Class Period**

***The Prospectus***

33.     The Prospectus listed numerous purported "competitive strengths" of the Company. Among these was a so-called "attractive financial model" characterized by an "asset-light business model":

> Attractive Financial Model.   Our business has several attractive financial features, including:

> Strong Cash Flow and Low Capital Requirements.  Due to our asset-light business model, limited need for additional working capital as we grow and moderate capital expenditures, our business generates strong cash flows that are available for reinvestment in our business, debt service, acquisitions and other uses.

34.     Sirva's insurance business is carried out through several subsidiaries, the most important one being Transguard Insurance Company of America, Inc. ("Transguard"). In the Prospectus, defendants reported that Sirva's insurance and claims reserves at December 31, 2002 and

September 30, 2003 totaled $75.9 million and $79.6 million, respectively, and that these amounts were reasonable:

> Insurance and Claims Reserves
>
> Transguard establishes reserves that are estimates of amounts needed to pay claims and related expenses in the future for insured events that have already occurred. The process of estimating reserves involves a considerable degree of judgment by management and, as of any given date, is inherently uncertain. Reserves include provisions for reported claims, or case estimates, provisions for incurred-but-not-reported claims and legal and administrative costs to settle claims. Reserve estimates are based upon past claims experience, knowledge of claims staff regarding the nature and potential cost of each claim and trends and estimates of future claims trends. These claims costs are influenced by many factors that change over time, such as changed coverage definitions as a result of new court decisions, inflation in costs to repair or replace damaged property, inflation in the cost of medical services, as well as the particular, unique facts that pertain to each claim. As a result, the rate at which claims arose in the past and the costs to settle them may not always be representative of what will occur in the future.
>
> Management believes that Transguard's insurance and claims reserves are reasonable, however, for the reasons previously discussed, the amounts of the reserves established as of a given balance sheet date and the subsequent actual losses and loss expenses paid will likely differ, perhaps by a material amount. There is no guarantee that recorded reserves will prove to be adequate. If management determines that an adjustment to insurance and claims reserves is appropriate, the adjustment to earnings is made in the accounting period in which such determination is made in accordance with GAAP.

     35.      In another section of the Prospectus, defendants purported to warn of the risks relating to its insurance reserves, stating as follows in relevant part:

> The reserves we maintain in our insurance business may prove to be inadequate to cover our actual losses sustained. Claims reserves do not represent an exact calculation of liability, but rather are estimates of the expected liability. To the extent that reserves are insufficient to cover actual losses, loss adjustment expenses or future policy benefits, we would have to add to our claim reserves and incur a charge to our earnings.

- 11 -

36.     The Prospectus contained the following results of operations and financial condition:

| | | Years Ended December 31, | | (Unaudited) Nine Months Ended September 30, | | |
| | | 2000 | 2001 | 2002 | 2002 | 2003 |
| | | | | (Dollars in millions except share and per share data) | | |

**Statement of Operations Data:**

| | | 2000 | 2001 | 2002 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| Operating revenues(1) Relocation Solutions— North America | $ | 1,791.8 $ | 1,652.1 $ | 1,544.4 $ | 1,173.1 $ | 1,240.4 |
| Relocation Solutions Europe & Asia Pacific | | 372.8 | 387.1 | 408.0 | 300.1 | 350.9 |
| Global Relocation Solutions | | 2,164.6 | 2,039.2 | 1,952.4 | 1,473.2 | 1,591.3 |
| Network Services | | 75.8 | 84.2 | 125.0 | 89.9 | 117.9 |
| Transportation Solutions | | 138.3 | 125.9 | 108.2 | 82.5 | 76.0 |
| Total Operating Revenues | $ | 2,378.7 $ | 2,249.3 $ | 2,185.6 $ | 1,645.6 $ | 1,785.2 |
| Purchased Transportation Expense(1) | $ | 1,559.8 $ | 1,438.8 $ | 1,303.2 $ | 990.6 $ | 1,002.1 |
| Other direct expense | $ | 433.8 $ | 426.4 $ | 463.9 $ | 343.5 $ | 429.9 |
| Gross margin | $ | 385.1 $ | 384.1 $ | 418.5 $ | 311.5 $ | 353.2 |
| Income from operations(2) Relocation Solutions— North America | $ | 8.1 $ | 15.1 $ | 41.0 $ | 35.2 $ | 44.9 |
| Relocation Solutions Europe & Asia Pacific | | 23.7 | 26.0 | 24.8 | 17.2 | 23.8 |
| Global Relocation Solutions | | 31.8 | 41.1 | 65.8 | 52.4 | 68.7 |
| Network Services | | 17.4 | 18.5 | 26.5 | 17.9 | 26.1 |
| Transportation Solutions | | 0.3 | (6.3) | 3.3 | 3.8 | 1.8 |

- 12 -

| | | | | | |
|---|---|---|---|---|---|
| Corporate | (0.1) | (0.8) | (1.3) | (1.0) | (3.7) |
| Total income from operations | $ 49.4 $ | 52.5 $ | 94.3 $ | 73.1 $ | 92.9 |
| Net income (loss)(2) | $ (21.9)$ | (16.9)$ | 20.8 $ | 17.0 $ | 30.9 |
| Pro Forma Information: | | | | | |
| Pro forma net income(2)(3) | | $ | 41.0 | --- $ | 47.5 |
| Per Share Data: | | | | | |
| Net income (loss) per share basic(2)(4) | $ (0.68)$ | (0.48)$ | 0.33 $ | 0.29 $ | 0.51 |
| Net income (loss) per share--- diluted(2)(4) | $ (0.68)$ | (0.48)$ | 0.33 $ | 0.28 $ | 0.48 |

| | As of September 30, 2003 | |
|---|---|---|
| | Actual | Pro Forma As Adjusted(2) |
| | (Dollars in millions) | |
| **Balance Sheet Data:** | | |
| Cash and cash equivalents | $ 60.7 $ | 60.7 |
| Property and equipment, net | 173.8 | 173.8 |
| Total assets(8) | 1,583.7 | 1,578.6 |
| Long-term debt(9) | 622.0 | 479.2 |
| Stockholders' equity(10) | 158.8 | 375.3 |

37. The Prospectus assured potential investors that the financial statements contained therein were prepared and presented in accordance with GAAP. In this regard, the Prospectus contained an opinion letter from Sirva's independent auditor, PricewaterhouseCoopers LLP, stating that Sirva's financial statements were prepared in accordance with GAAP and fairly presented the Company's financial results and condition:

> In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of SIRVA, Inc. and its subsidiaries at December 31, 2002 and December 31, 2001, and the results of their operations and their cash flows for each of the three years in the period ended

- 13 -

December 31, 2002 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the index appearing under Item 16(b) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

38. The above representations made in the Prospectus (¶¶33-37) contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, because defendants failed to disclose the following facts, among others:

(a) The Company's insurance and claim reserves were grossly inadequate and unreasonable;

(b) As a result of the foregoing, the earnings and shareholders' equity reported in the Prospectus were materially inflated, violated GAAP, and failed to give a fair representation of Sirva's true results and financial condition;

(c) The Prospectus's purported warning about its reserves was in itself materially false and misleading because the Company was not properly reserved at the time the warning was issued. The warning about potential future shortfalls represented that the reserves were, at that time, adequate, which was untrue.

(d) Contrary to its express representations, the Company's business model was not "asset-light." In fact, the Company's business, especially its European operations, were asset-

- 14 -

intensive and saddled with high fixed-costs that presented a serious, but undisclosed, risk to Sirva's operations and ability to maintain profitability.

***Additional reasons why the Company's reported financial statements were materially false and misleading are set forth in ¶¶ 66-79, below.***

### Sirva's 2003 Results

39.     On February 10, 2004, Sirva issued a press release announcing results for its full year and fourth quarter ended December 31, 2003. According to the press release, Sirva's 2003 net income, excluding special items, more than doubled since 2002, while revenue rose 8%:

> CHICAGO, Feb. 10 /PRNewswire-FirstCall/ -- SIRVA, Inc. (NYSE: SIR), a global relocation services provider, today reported net income of $19.0 million, or $0.27 per diluted share, for the full year ended December 31, 2003. This includes expenses of $28.0 million after tax, or $0.46 per diluted share, related to the company's November 2003 Initial Public Offering and recapitalization.

> Excluding these unusual charges, SIRVA's 2003 net income was $47.0 million, or $0.73 per diluted share, more than double the performance for the year ended December 31, 2002. The company recorded net income of $20.8 million, or $0.33 per diluted share, for the full year 2002.

> SIRVA's operating revenue for the full year 2003 was $2.35 billion, an increase of 8 percent from the previous year. The company's revenue less Purchased Transportation Expense (PTE)(i), or net revenue, was $1 billion, up 19 percent from the previous year. SIRVA's 2003 income from operations, excluding the unusual charges, was $129.7 million, a 38 percent increase from the previous year.

Defendant Kelley commented on the favorable reported results, touting the Company's success, which, according to him, was expected to continue in 2004:

> "We are very pleased with our results for 2003, as they cap what was a remarkable year for SIRVA," said Brian P. Kelley, president and chief executive officer of SIRVA. "We transitioned from a private to a public company, expanded our global footprint, enhanced our customer-centric services, and delivered outstanding results. Our mission going forward is to generate sustainable revenue, cash and profit growth while continuing to redefine the global relocation services marketplace."

> ***

"Our results for the fourth quarter reflect the success of our strategy in the marketplace," said Kelley. "We expect to carry this positive overall momentum into 2004."

***

"We are off to a great start and continue to make significant progress in winning new clients, expanding our relocation services around the world and streamlining our costs," said Kelley. "We recently began providing relocation services to Dell, Delphi and KPMG, and we expect to gain more customers as companies continue to look for ways to outsource their employee relocations with quality and efficiency in an increasingly competitive global marketplace."

40.     On March 26, 2004, Sirva filed its annual report on Form 10-K with the SEC. The Form 10-K was signed by defendants Kelley, Ryan and Rogers, reiterated the financial information reported in the February 10, 2004 press release and detailed the following financial results and financial condition:

| | Years Ended December 31, | | | | Year Ended December 25, |
|---|---|---|---|---|---|
| | 2003(3) | 2002(3) | 2001(3) | 2000(3) | 1999(2)(3) |
| | | | (Dollars in millions except percentage, share and per share data) | | |
| **Statement of Operations Data:** | | | | | |
| Operating revenues(1) | | | | | |
| Relocation Solutions— North America | $ 1,602.9 $ | 1,544.4 $ | 1,652.1 $ | 1,791.8 | $ 933.3 |
| Relocation Solutions— Europe and Asia Pacific | 478.2 | 408.0 | 387.1 | 372.8 | 99.9 |
| Global Relocation Solutions | 2,081.1 | 1,952.4 | 2,039.2 | 2,164.6 | 1,033.2 |
| Network Services | 163.2 | 125.0 | 84.2 | 75.8 | 8.8 |
| Transportation Solutions | 105.6 | 108.2 | 125.9 | 138.3 | 117.8 |

- 16 -

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| $ | 2,349.9 $ | 2,185.6 $ | 2,249.3 $ | 2,378.7 | $ 1,159.8 |

| | | | | | |
|---|---|---|---|---|---|
| Purchased transportation expense(1) | $ 1,299.9 $ | 1,303.2 $ | 1,438.8 $ | 1,559.8 $ | 732.6 |
| Other direct expense | 576.1 | 463.9 | 426.4 | 433.8 | 223.8 |
| Gross margin | $ 473.9 $ | 418.5 $ | 384.1 $ | 385.1 $ | 203.4 |
| Income (loss) from operations(4) | | | | | |
| Relocation Solutions—North America | $59.8 | $41.0 | $15.1 | $8.1 | $(10.5) |
| Relocation Solutions—Europe and Asia Pacific | 30.2 | 24.8 | 26.0 | 23.7 | 2.7 |
| Global Relocation Solutions | 90.0 | 65.8 | 41.1 | 31.8 | (7.8) |
| Network Services | 36.7 | 26.5 | 18.5 | 17.4 | 3.8 |
| Transportation Solutions | 4.1 | 3.3 | (6.3) | 0.3 | 2.9 |
| Corporate | (4.6) | (1.3) | (0.8) | (0.1) | — |
| | $126.2 | $94.3 | $52.5 | $49.4 | $(1.1) |
| Income (loss) before cumulative effect of accounting change(4)(5) | $19.0 | $20.8 | $(16.6) | $(21.9) | $(20.5) |
| Cumulative effect of accounting change, net of tax(6) | — | — | (0.3) | — | — |
| Net income (loss)(4)(5)(8) | $19.0 | $20.8 | $(16.9) | $(21.9) | $(20.5) |
| **Per Share Data (4)(5):** | | | | | |
| Income (loss) per share before cumulative effect of accounting change—basic (7) | $ 0.29 $ | 0.33 $ | (0.47) $ | (0.68) $ | (0.89) |
| Income (loss) per share before cumulative effect of accounting change—diluted (7) | $ 0.27 $ | 0.33 $ | (0.47) $ | (0.68) $ | (0.89) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) per share—basic (7)(8) | $ | 0.29 | $ | 0.33 | $ | (0.48) | $ | (0.68) $ | (0.89) |
| Net income (loss) per share—diluted (7)(8) | $ | 0.27 | $ | 0.33 | $ | (0.48) | $ | (0.68) $ | (0.89) |
| Weighted-average common shares outstanding: | | | | | | | | | |
| Basic | | 58,104,742 | | 51,712,625 | | 42,308,361 | | 39,065,685 | 23,285,669 |
| Diluted | | 60,933,868 | | 51,832,236 | | 42,308,361 | | 39,065,685 | 23,285,669 |
| **Balance Sheet Data:** | | | | | | | | | |
| Cash and cash equivalents | $ | 63.1 | $ | 45.5 | $ | 32.1 | $ | 43.5 $ | 25.2 |
| Property and equipment, net | | 181.0 | | 171.3 | | 165.4 | | 158.7 | 165.9 |
| Total assets | | 1,549.4 | | 1,357.5 | | 1,074.0 | | 1,199.6 | 1,152.5 |
| Short-term debt (9) | | 101.5 | | 99.7 | | 68.2 | | 99.1 | 78.3 |
| Long-term debt (10) | | 445.5 | | 571.8 | | 505.0 | | 504.8 | 511.5 |
| Redeemable common stock (11) | | ---- | | 7.4 | | 3.3 | | 6.1 | 7.0 |
| Redeemable junior preferred stock (12) | | ---- | | 30.4 | | 28.3 | | 26.4 | 24.6 |
| Stockholders' equity | | 395.3 | | 128.3 | | 61.9 | | 94.0 | 99.8 |

41.    In the Form 10-K, defendants reassured investors that the financial results reported therein were presented in accordance with GAAP and fairly presented the Company's results. In this regard, the Form 10-K contained a report from PricewaterhouseCoopers LLP, Sirva's independent auditor, stating as follows in relevant part:

> In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of SIRVA, Inc. and its subsidiaries at December 31, 2003 and December 31, 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by

management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

42.     The Company's Network Services division, which encompasses its insurance operations, experienced a reported 30.6% increase in revenues, a 26.8% increase in gross margins and a 38.5% increase in income from operations, as reported in the Form 10-K. Strongly touting Sirva's insurance operations, defendants highlighted the supposedly "measured approach" and consistent profitability of its insurance business, stating as follows in the Form 10-K:

> As a result of our focus on a targeted customer base and industry knowledge acquired through our other operations, we can design product offerings that are tailored for the needs of our target market. We believe that competitors without moving operations lack this knowledge and specific market focus, and offer more generic solutions that are not as attractive to our customers. We are cautious in choosing which customers to insure and what kinds of insurance to write. We do not write significant amounts of longer-tail, more open-ended liability insurance products, such as workers' compensation. Our measured approach is reflected in our historical operating performance; we have consistently earned a profit on our underwriting activity, which in 2003 represents approximately 68% of our income from operations in our insurance business; investment income represents the balance. Our combined loss and expense ratio was 82% at the end of 2003, has been below 100% for the past ten years and has declined each year since 1998. The combined loss and expense ratio is a key measure of underwriting profitability traditionally used in the property and casualty business. When the combined ratio is under 100%, underwriting results are generally considered profitable.

43.     As they had done in the Prospectus, defendants represented that Sirva's insurance and claims reserves (which were reportedly $76.1 million as of December 31, 2003) were reasonable, stating as follows in the Form 10-K:

Insurance and Claims Reserves

Transguard establishes reserves that are estimates of amounts needed to pay claims and related expenses in the future for insured events that have already occurred. The process of estimating reserves involves a considerable degree of judgment by management and, as of any given date, is inherently uncertain. Reserves include provisions for reported claims, or case estimates, provisions for incurred-but-not-reported claims and legal and administrative costs to settle claims. Reserve estimates are based upon past claims experience, knowledge of claims staff regarding the

nature and potential cost of each claim and trends and estimates of future claims trends. These claims costs are influenced by many factors that change over time, such as changed coverage definitions as a result of new court decisions, inflation in costs to repair or replace damaged property, inflation in the cost of medical services, as well as the particular, unique facts that pertain to each claim. As a result, the rate at which claims arose in the past and the costs to settle them may not always be representative of what will occur in the future.

Management believes that Transguard's insurance and claims reserves are reasonable, however, for the reasons previously discussed, the amounts of the reserves established as of a given balance sheet date and the subsequent actual losses and loss expenses paid will likely differ, perhaps by a material amount. There is no guarantee that recorded reserves will prove to be adequate. If management determines that an adjustment to insurance and claims reserves is appropriate, the adjustment to earnings is made in the accounting period in which such determination is made in accordance with generally accepted accounting principles ("GAAP").

44.     In addition, the Form 10-K contained the following purported warning about Sirva's insurance and claims reserves:

The reserves we maintain in our insurance business may prove to be inadequate to cover our actual losses sustained. Claims reserves do not represent an exact calculation of liability, but rather are estimates of the expected liability. To the extent that reserves are insufficient to cover actual losses, loss adjustment expenses or future policy benefits, we would have to add to our claim reserves and incur a charge to our earnings.

45.     The statements referenced above regarding Sirva's 2003 results (¶¶ 40-45) were materially false and misleading when made and known by defendants to be materially false and misleading because they failed to disclose the following facts, among others:

(a)     The Company's insurance and claim reserves were grossly inadequate and unreasonable;

(b)     As a result of the foregoing, the earnings and shareholders' equity reported in the Prospectus were materially inflated, violated GAAP and failed to give a fair representation of Sirva's true results and financial condition;

- 20 -

(c)    The purported warning about Sirva's reserves was in itself materially false and misleading because the Company had been under reserving in order to artificially boost its reported reserves. The warning about potential future shortfalls represented that the reserves were, at that time, adequate, which was untrue; and

(d)    Sirva's insurance operations had been materially artificially buoyed by Sirva's failure to properly reserve for insurance and claims losses rather than the legitimate operational factors claimed by defendants in the Form 10-K.

*Additional reasons why the Company's reported financial statements were materially false and misleading are set forth in ¶¶ 66-79, below.*

### Sirva's First Quarter of 2004

46.    On April 27, 2004, Sirva announced "strong result for the first quarter ended March 31, 2004." In a press release, defendants reported double-digit growth in revenues and income in the quarter:

> CHICAGO, April 27 /PRNewswire-FirstCall/ -- SIRVA, Inc. (NYSE: SIR), a global relocation services provider, today reported net income of $6.4 million, or $0.09 per diluted share, for the first quarter ended March 31, 2004. This represents a $7.9 million increase from the company's net loss of $1.5 million, or $0.05 per diluted share, for the first quarter of 2003.
>
> SIRVA's operating revenue for the first quarter 2004 was $529.0 million, an increase of 11.6 percent from $474.2 million in operating revenue for the first quarter 2003. The company's revenue less Purchased Transportation Expense (PTE), or net revenue, was $265.6 million for the first quarter 2004, up 21.7 percent from $218.3 million in net revenue for the first quarter of last year, partially driven by favorable foreign currency impacts and by acquisitions. SIRVA's 2004 first quarter income from operations was $16.4 million, up 28.1 percent from $12.8 million in income from operations for the first quarter of 2003.

Defendants Kelley touted the Company's reported results, claiming that all of Sirva's operating segments performed well:

"Our strong first quarter results reflect the strength of our relocation offerings around the world," said Brian P. Kelley, president and chief executive officer of SIRVA. "We're redefining relocation for our customers and bringing them real quality improvements and cost reductions. All four of our business segments performed well operationally and we made significant progress in broadening our services offering and expanding our presence throughout the European continent."

"Volume in U.S. relocation initiations increased by 27 percent in the quarter versus the first quarter of last year, driving a 51 percent increase in relocation services revenue," said Kelley. "In addition, for the first time in three years, we experienced a year-over-year increase in moving volumes. These positive trends offset a continued weakness in the specialized transportation business in North America. Over the next six months we will be evaluating our strategic options for the specialized transportation business."

47.    According to defendants, the Company's business was so strong that they were raising its earnings guidance for the year. Defendant Kelley stated as follows in this regard:

"We are confident in our ability to meet our financial goals for 2004: a plus 10 percent increase in organic net revenue and a plus 20 percent increase in operating income," Kelley said. "Given our first quarter performance, and the positive forward indicators for relocation initiations and moving volumes, we are raising our earnings per share guidance for the year from $1.15 -- $1.16 to $1.17 -- $1.20. For the second quarter we expect earnings per share of $0.22 -- $0.23. This compares to earnings of $0.09 per share realized in the second quarter of last year."

48.    On May 7, 2004, Sirva filed its first quarter 2004 report with the SEC on Form 10-Q. The report was signed by defendant Ryan and reiterated the financial information contained in the April 27, 2004 press release. In addition, defendants detailed Sirva's quarterly performance and financial condition, reporting as follows:

|  | Three Months Ended | |
| --- | --- | --- |
|  | March 31, 2003 | March 31, 2004 |
| Operating revenues | $       474,193 | $       528,961 |
| Operating expenses: | | |
| Purchased transportation expense | 255,912 | 263,338 |
| Other direct expense | 123,638 | 154,892 |
| Total direct expenses | 379,550 | 418,230 |

- 22 -

| | | |
|---|---:|---:|
| Gross margin | 94,643 | 110,731 |
| General and administrative expense | 80,358 | 92,373 |
| Intangibles amortization | 1,487 | 1,926 |
| Income from operations | 12,798 | 16,432 |
| Other income (expense) | (22) | (71) |
| Interest expense | 15,013 | 6,738 |
| Income (loss) before income taxes | (2,237) | 9,623 |
| Provision (benefit) for income taxes | (770) | 3,200 |
| Net income (loss) | $ (1,467) $ | 6,423 |
| Net income (loss) per share—basic | $ (0.05) $ | 0.09 |
| Net income (loss) per share—diluted | $ (0.05) $ | 0.09 |

| Assets | December 31, 2003 | March 31, 2004 |
|---|---:|---:|
| Total current assets | 661,152 | 663,020 |
| Total long-term assets | 888,205 | 889,074 |
| Total assets | $ 1,549,357 $ | 1,552,094 |
| **Liabilities and Stockholders' Equity** | | |
| Total current liabilities | 609,256 | 554,998 |
| Total long-term liabilities | 544,753 | 595,019 |
| Total liabilities | 1,154,009 | 1,150,017 |
| Total liabilities and stockholders' equity | $ 1,549,357 $ | 1,552,094 |

49.     According to the quarterly report, the Company's insurance and claims reserves were

$74.1 million at the end of the quarter.

- 23 -

50.     The statements referenced above relating to Sirva's first quarter of 2004 results (¶¶ 47-50) were materially false and misleading when made and known by defendants to be materially false and misleading because they failed to disclose the following facts, among others:

(a)     The Company's insurance and claim reserves were grossly inadequate and unreasonable;

(b)     As a result of the foregoing, the earnings and shareholders' equity reported in the Prospectus were materially inflated, violated GAAP and failed to give a fair representation of Sirva's true results and financial condition;

(c)     Given the way in which the Company had artificially boosted its reported performance through the inherently unsustainable practice of inadequately reserving for insurance risks, the Company's projections, which were adjusted materially upwards during the quarter, were lacking in any reasonable basis when made.

***Additional reasons why the Company's reported financial statements were materially false and misleading are set forth in ¶¶ 66-79, below.***

## *Sirva's Secondary Offering*

51.     Sirva's Secondary Offering was commenced on the heels of its favorable first-quarter earnings announcement. On June 10, 2004, Sirva's registration statement and incorporated prospectus for the Secondary Offering became effective and the selling stockholders sold 18,500,000 shares of Sirva common stock at $22 per share. All of the shares sold in the Secondary Offering were sold by the selling stockholders, not the Company itself.

52.     Of the 18,500,000 shares sold, 15,022,831 shares were sold by the entities in which defendants Rogers and Schnall had an interest: 10,611,629 shares were sold by Clayton, Dubilier & Rice Fund V Limited Partnership and 4,411,202 were sold by Clayton, Dubilier & Rice Fund VI

Limited Partnership. As discussed above in ¶ 4, defendants Rogers and Schnall had a financial interest in these entities, thereby profiting indirectly from the sale of 15,022,831 shares, and controlled them.

53.    The Secondary Prospectus contained much of the same materially false and misleading statements contained in the Prospectus. The Secondary Prospectus, which was signed by each of the Individual Defendants, presented Sirva's results of operations and financial condition, as follows:

|  | Years Ended December 31, | | | (Unaudited) Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
|  | 2001 | 2002 | 2003 | 2003 | 2004 |
|  | (Dollars in millions except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Operating revenues(1) | | | | | |
| Relocation Solutions—North America | $ 1,652.1 $ | 1,544.4 $ | 1,602.9 $ | 315.5 $ | 325.0 |
| Relocation Solutions Europe & Asia Pacific | 387.1 | 408.0 | 478.2 | 101.3 | 131.3 |
| Global Relocation Solutions | 2,039.2 | 1,952.4 | 2,081.1 | 416.8 | 456.3 |
| Network Services | 84.2 | 125.0 | 163.2 | 35.5 | 46.5 |
| Transportation Solutions | 125.9 | 108.2 | 105.6 | 21.9 | 26.2 |
| Total Operating Revenues | $ 2,249.3 $ | 2,185.6 $ | 2,349.9 $ | 474.2 $ | 529.0 |
| Purchased Transportation Expense(1) | $ 1,438.8 $ | 1,303.2 $ | 1,299.9 $ | 255.9 $ | 263.3 |
| Other direct expense | $ 426.4 $ | 463.9 $ | 576.1 $ | 123.6 $ | 154.9 |
| Gross margin | $ 384.1 $ | 418.5 $ | 473.9 $ | 94.7 $ | 110.8 |
| Income from operations(2) | | | | | |
| Relocation Solutions—North America | $ 15.1 $ | 41.0 $ | 59.8 $ | 1.9 $ | 2.1 |
| Relocation Solutions Europe & Asia Pacific | 26.0 | 24.8 | 30.2 | 3.6 | 5.3 |
| Global Relocation Solutions | 41.1 | 65.8 | 90.0 | 5.5 | 7.4 |
| Network Services | 18.5 | 26.5 | 36.7 | 8.1 | 9.5 |
| Transportation Solutions | (6.3) | 3.3 | 4.1 | (0.5) | 0.5 |
| Corporate | (0.8) | (1.3) | (4.6) | (0.3) | (1.0) |
| Total income from operations | $ 52.5 $ | 94.3 $ | 126.2 $ | 12.8 $ | 16.4 |

| | | | | | |
|---|---|---|---|---|---|
| Net income (loss)(2) | $ (16.9)$ | 20.8 $ | 19.0 $ | (1.5)$ | 6.4 |
| **Per Share Data:** | | | | | |
| Net income (loss) per share basic(2)(3) | $ 0.33 $ | 0.33 $ | 0.29 $ | (0.05)$ | 0.09 |
| Net income (loss) per share diluted(2)(3) | $ 0.33 $ | 0.33 $ | 0.27 $ | (0.05)$ | 0.09 |

| | | | | (Unaudited) Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | **Years Ended December 31,** | | | | |
| | **2001** | **2002** | **2003** | **2003** | **2004** |
| Weighted average common shares outstanding | | | | | |
| Basic | 42,308,361 | 51,712,625 | 58,104,742 | 56,557,091 | 70,445,673 |
| Diluted | 42,308,361 | 51,832,236 | 60,933,868 | 56,557,091 | 75,236,074 |

| | As of March 31, 2004 |
|---|---|
| **Balance Sheet Data:** | |
| Cash and cash equivalents | $ 73.9 |
| Property and equipment, net | 177.1 |
| Total assets | 1,552.1 |
| Long-term debt(6) | 493.2 |
| Stockholders' equity | 402.1 |

54.    According to the Secondary Prospectus, the financial statements included therein were prepared in accordance with GAAP and fairly set forth the Company's results of operations and financial condition. A report from PricewaterhouseCoopers LLP, Sirva's independent auditors, the Secondary Prospectus reassured investors of the following:

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of SIRVA, Inc. and its subsidiaries at December 31, 2003 and December 31, 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with the standards

- 26 -

of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

55.     In the Secondary Prospectus, defendants again touted its purportedly "asset-light" business model as a competitive strength:

Attractive Financial Model.   Our business has several attractive financial features, including:

Strong Cash Flow and Low Capital Requirements. Due to our asset-light business model, limited need for additional working capital as we grow and moderate capital expenditures, our business generates strong cash flows that are available for reinvestment in our business, debt service, acquisitions and other uses.

56.     In the Secondary Prospectus, defendants reported that Sirva's insurance and claims reserves at March 31, 2004 totaled $71.3 million, an amount characterized as reasonable:

Transguard establishes reserves that are estimates of amounts needed to pay claims and related expenses in the future for insured events that have already occurred. The process of estimating reserves involves a considerable degree of judgment by management and, as of any given date, is inherently uncertain. Reserves include provisions for reported claims, or case estimates, provisions for incurred-but-not-reported claims and legal and administrative costs to settle claims. Reserve estimates are based upon past claims experience, knowledge of claims staff regarding the nature and potential cost of each claim and trends and estimates of future claims trends. These claims costs are influenced by many factors that change over time, such as changed coverage definitions as a result of new court decisions, inflation in costs to repair or replace damaged property, inflation in the cost of medical services, as well as the particular, unique facts that pertain to each claim. As a result, the rate at which claims arose in the past and the costs to settle them may not always be representative of what will occur in the future.

Management believes that Transguard's insurance and claims reserves are reasonable; however, for the reasons previously discussed, the amounts of the reserves established as of a given balance sheet date and the subsequent actual losses and loss expenses paid will likely differ, perhaps by a material amount. There is no guarantee that recorded reserves will prove to be adequate. If management determines that an adjustment to insurance and claims reserves is appropriate, the adjustment to earnings

is made in the accounting period in which such determination is made in accordance with generally accepted accounting principles.

57.     In another section of the Secondary Prospectus, defendants purported to warn of the risks relating to its insurance reserves, stating as follows in relevant part:

> The reserves we maintain in our insurance business may prove to be inadequate to cover our actual losses sustained. Claims reserves do not represent an exact calculation of liability, but rather are estimates of the expected liability. To the extent that reserves are insufficient to cover actual losses, loss adjustment expenses or future policy benefits, we would have to add to our claim reserves and incur a charge to our earnings.

58.     The statements referenced in the Secondary Prospectus set forth in (¶¶54-58) contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, because defendants failed to disclose the following facts, among others:

(a)     The Company's insurance and claim reserves were grossly inadequate and unreasonable;

(b)     As a result of the foregoing, the earnings and shareholders' equity reported in the Prospectus were materially inflated, violated GAAP and failed to give a fair representation of Sirva's true results and financial condition;

(c)     The Prospectus's purported warning about its reserves was in itself materially false and misleading because the Company had been under reserving in order to artificially boost its reported reserves. The warning about potential future shortfalls represented that the reserves were, at the time, adequate, which was untrue;

- 28 -

(d)    contrary to its express representations, the Company's business model was not "asset-light." In fact, the Company's business, especially its European operations, were asset-intensive and saddled with high fixed-costs that presented a serious, but undisclosed, risk to Sirva's ability to maintain profitability.

*Additional reasons why the Company's reported financial statements were materially false and misleading are set forth in ¶¶ 66-79, below.*

### Sirva's Second Quarter of 2004

59.    On August 5, 2004, Sirva reported "strong results for the second quarter" of 2004, with operating revenue up 15% and net income nearly tripling, compared to the second quarter of 2003:

> CHICAGO, Aug. 5 /PRNewswire-FirstCall/ -- SIRVA, Inc. (NYSE: SIR), a global relocation services provider, today reported net income of $17.5 million, or $0.23 per diluted share, for the second quarter ended June 30, 2004. This represents an $11.3 million increase from the company's net income of $6.2 million, or $0.09 per diluted share, for the second quarter of 2003.
>
> Excluding one-time items, SIRVA reported earnings of $0.24 per diluted share in the second quarter, more than double the second quarter of 2003. SIRVA's operating revenue for the second quarter of 2004 was $668.8 million, an increase of 15.4 percent from $579.8 million in operating revenue for the second quarter 2003. The company's revenue less Purchased Transportation Expense (PTE), or net revenue, was $319.7 million for the second quarter of 2004, up 23.1 percent from $259.7 million in net revenue for the second quarter of last year. SIRVA's second quarter 2004 income from operations was $33.0 million, up 33.6 percent from $24.7 million in income from operations for the second quarter of 2003.

In addition, defendants expressed confidence in Sirva's ability to meet the previously disseminated earnings guidance:

> With strong performance in the first half of the year, the company remains confident that it will deliver on its stated objective of $1.17 - $1.20 earnings per share for 2004, based on an average share count assumption of 75.5 million shares. With the exercise

of the Exel warrants, the average sharecount will now be approximately 77.1 million shares in the third and fourth quarters. Accounting for this impact, the company's revised guidance for 2004 is a range of $1.15 - $1.18 per diluted share.

60.     On August 13, 2004, Sirva filed its second quarter report on Form 10-Q with the SEC. The report was signed by defendant Ryan and reiterated the financial information conveyed in the August 5, 2004 release. The following results were reported (dollars in thousands except per-share amounts):

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2004 | June 30, 2003 | June 30, 2004 | June 30, 2003 |
| Operating revenues | $ 668,766 | $ 579,803 | $ 1,197,727 | $ 1,053,996 |
| Operating expenses: | | | | |
| Purchased transportation expense | 349,076 | 320,072 | 612,415 | 575,985 |
| Other direct expense | 182,382 | 144,886 | 337,274 | 268,523 |
| Total direct expenses | 531,458 | 464,958 | 949,689 | 844,508 |
| Gross margin | 137,308 | 114,845 | 248,038 | 209,488 |
| General and administrative expense | 102,392 | 88,903 | 194,764 | 169,262 |
| Intangibles amortization | 1,925 | 1,279 | 3,851 | 2,765 |
| Income from operations | 32,991 | 24,663 | 49,423 | 37,461 |
| Other income (expense) | 641 | (120) | 570 | (142) |
| Debt extinguishment expense | 565 | | 565 | — |
| Interest expense | 6,782 | 15,067 | 13,520 | 30,080 |
| Income before income taxes | 26,285 | 9,476 | 35,908 | 7,239 |
| Provision for income taxes | 8,749 | 3,264 | 11,949 | 2,493 |
| Net income | $ 17,536 | $ 6,212 | $ 23,959 | $ 4,746 |
| Net income per share—basic | $ 0.25 | $ 0.09 | $ 0.34 | $ 0.04 |
| Net income per share—diluted | $ 0.23 | $ 0.09 | $ 0.32 | $ 0.04 |

| | June 30, 2004 | December 31, 2003 |
| --- | --- | --- |
| **Assets** | | |
| **Total current assets** | 848,939 | 661,152 |
| **Total long-term assets** | 891,607 | 888,205 |
| **Total assets** | $ 1,740,546 | $ 1,549,357 |
| **Liabilities and Stockholders' Equity** | | |
| **Total current liabilities** | 720,471 | 609,256 |
| **Total long-term liabilities** | 564,422 | 544,753 |

| | | |
|---|---|---|
| Total liabilities | 1,284,893 | 1,154,009 |
| Commitments and contingencies (Note 9) | | |
| Total stockholders' equity | 455,653 | 395,348 |
| Total liabilities and stockholders' equity | $ 1,740,546 | $ 1,549,357 |

61.     According to the quarterly report, Sirva's insurance and claims reserves were $78.1 million as of June 30, 2004.

62.     The statements referenced above relating to Sirva's second quarter of 2004 results (¶¶ 60-62) were materially false and misleading when made and known by defendants to be materially false and misleading because they failed to disclose the following facts, among others:

(a)     The Company's insurance and claim reserves were grossly inadequate and unreasonable;

(b)     As a result of the foregoing, the earnings and shareholders' equity reported in the Prospectus were materially inflated, violated GAAP and failed to give a fair representation of Sirva's true results and financial condition;

(c)     Given the way in which the Company had artificially boosted its reported performance through the inherently unsustainable practice of inadequately reserving for insurance risks, the Company's projections, which were reaffirmed during the quarter, were lacking in any reasonable basis when made.

***Additional reasons why the Company's reported financial statements were materially false and misleading are set forth in ¶¶66-79, below.***

- 31 -

## THE TRUTH BEGINS TO EMERGE

63.     Sirva's inadequate insurance and claims reserves were revealed on November 9,

2004, after the close of ordinary trading, when, in announcing Sirva's third quarter 2004 results,

defendants revealed that Sirva was forced to take a $15.2 million charge to increase insurance

loss reserves. Because of the charge, and poor results in Europe, Sirva reported a sharp decline in

operating income:

> CHICAGO, Nov. 9 /PRNewswire-FirstCall/ -- SIRVA, Inc. (NYSE: SIR), a global
> relocation services provider, today reported that operating revenue from continuing
> operations for the third quarter of 2004 was $710.7 million, an increase of 12 percent
> from $632.7 million in operating revenue for the third quarter of 2003. The
> company's revenue less Purchased Transportation Expense (PTE), or net revenue
> from continuing operations, was up 18 percent from the same period last year to $297
> million. Excluding acquisitions, net revenue grew 13 percent.
>
> Operating income from continuing operations in the third quarter was $44.5 million
> compared to $55.4 million for the comparable 2003 period. Income from continuing
> operations for the quarter was $25.9 million, versus $27.2 million last year. Earnings
> per share from continuing operations in the quarter were $0.34 versus $0.45 in the
> comparable period last year.
>
> Third quarter results were primarily impacted by a $15.2 million charge to increase
> insurance loss reserves in addition to difficult operating conditions in Europe. The
> company noted that its core North American relocation business, its largest segment,
> continued to perform very well in the third quarter, both in terms of industry share
> and operating income.

According to the press release, Sirva's insurance business would be negatively impacted as the

Company would discontinue certain business lines:

> During the quarter, the company increased its insurance loss reserves by
> approximately $15.2 million to reflect adverse loss development in certain lines of
> business. The company expects that insurance will remain a stable, profitable, but
> smaller business because of its actions to discontinue or cap new policies in certain
> business lines while raising premiums and increasing the use of reinsurance.

Finally, Sirva announced that, because of the belatedly disclosed problems, it was

significantly scaling back its expectations, "revising its 2004 earnings guidance to $0.85 –

$0.87 per share from continuing operations," from the $1.17 - $1.20 per share it reaffirmed in its second quarter press release.

64.     Later that same day, Sirva held a conference call with analysts that was available to investors and archived on its website. A transcript of the call is available publicly from various services, such as Call Street. During the call, defendant Kelley stated, in discussing the European operations and fielding an analyst's question, that the reason European results disappointed was high fixed costs, a situation that was being remedied through a substantial restructuring. These statements directly contradicted defendants' Class Period representations, made in the Prospectus and Secondary Prospectus, touting Sirva's so-called "asset-light" business model as a competitive advantage. As defendant Kelley made clear, Sirva's European operations had, in fact, been "asset-intensive":

> [Kelley]: So, looking ahead, the continental Europe economies remained challenged and the UK market is unlikely to reverse by year-end. So we need to get to a lower cost, *less asset-intensive* model in Europe. That's the background. Here is what we are going to do to fix it. First, we have made leadership changes to execute this plan. We will be announcing tomorrow a new leader. . . Second, we have identified very specific near-term cost reductions that are being implemented throughout Europe. These initiatives will get our cost structure in-line to what we expect to be the new market realities through 2005. Here are some of them. We are closing 11 of our 26 UK operating centers over the next three months, we are reducing headcount by about 200 across our European operations and we have already started what will be an ongoing transition of the European moving operating model to more closely replicate the asset-light model we have here in North America enabling our cost structure to flex with demand.
>
> ***
>
> Q—Jonathan Shapiro: You know, you've gotten rid of a few of these businesses, as you deemed to be non-core and by all accounts, by all measures the relocation North America [business] is doing, you know, in better than you have been thinking a few months ago. Do you need to be in some of these other businesses, the insurance business, you know, NAIT, even Europe, I mean, most of the business over there is moving. You know, do you need to be in that to do global relocation?

A [Kelley]: You need to be, in global relocation. You need to have a European footprint. It needs to be efficient and it can't have the kind of fixed cost we have there today and that's where we are getting it out.

65.     These disclosures caused Sirva's stock price to drop from $23.78 per share on November 9, 2004 to $17.95 per share on November 10, 1004, a one day drop of 24.5%, on unusually heavy trading volume.

## SIRVA'S FALSE AND MISLEADING
## FINANCIAL STATEMENTS, FINANCIAL DISCLOSURES AND OMISSIONS

66.     Throughout the Class Period, defendants represented that Sirva's financial statements were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in order to artificially inflate the price of Sirva's stock, defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate the company's balance sheet and to falsely report earnings for the reporting periods ending during the Class Period.

67.     Defendants caused Sirva's financial statements to violate GAAP and SEC rules by improperly failing to establish adequate reserves for its insurance business and claiming that these were reasonable and adequate.

68.     As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment

- 34 -

and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

69.     SEC Rule 4-01(a) of SEC Regulation S-X provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform to GAAP. As stated in the professional standards adopted by the AICPA:

> financial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

**Sirva Improperly Failed to Set Adequate
Insurance and Claim Reserves**

70.     During the Class Period, defendants represented that Sirva's insurance and claim reserves were reasonable.

71.     Contrary to defendants' assertions, Sirva failed to properly establish adequate reserves for its insurance business.

72.     Under GAAP, "the liability for unpaid claims and claim adjustment expenses represents the amounts needed to provide for the estimated ultimate cost of settling claims relating to insured events that have occurred on or before a particular date (ordinarily, the statement of financial position date). The estimated liability includes the amount of money that will be required for future

payments of (a) claims that have been reported to the insurer, (b) claims related to insured events that have occurred but that have not been reported to the insurer as of the date the liability is estimated, and (c) claim adjustment expenses." AICPA Statement of Position No. 94- 5 ¶ 10 (December 15, 1994).

73. Moreover, GAAP provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated. FASB Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies ¶ 8 (March 1975). SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible (i.e., greater than a slight chance) that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or a range of loss, or state that such an estimate cannot be made.

74. In addition, GAAP provides that if the reasonable estimate of a particular loss contingency is a range, an amount shall be accrued for the loss. When some amount within the range appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued. FASB Interpretation No. 14, Reasonable Estimation of the Amount of a Loss ¶ 3 (September 1976).

75. The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that, although disclosures in interim period financial statements may be abbreviated and need not duplicate the

disclosure contained in the most recent audited financial statements, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred." 17 C.F.R. § 210.10-01.

76.     Defendants violated the GAAP requirement by failing to take a provision to establish adequate loss reserves in Sirva's interim financial statements, as indicated by APB Opinion No. 28, Interim Financial Reporting ¶ 17:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

77.     In addition, FASB Statement of Concepts No. 5 states that "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . . ."

78.     As defendants eventually were forced to admit, the materiality of these irregularities resulted in a separate charge of $15.2 million in the third quarter of 2004.

**Sirva's Materially False and Misleading Financial Statements**

79.     As a result of the accounting improprieties described above, defendants caused Sirva's reported financial results to violate the following provisions of GAAP, for which each defendant is responsible:

a.      The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities. (FASB Statement of Concepts No. 1 ¶ 34).

b.      The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.  (FASB Statement of Concepts No. 2 ¶ 132).

c.      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (FASB Statement of Concepts No. 1 ¶ 50).

d.      The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASB Statement of Concepts No. 1 ¶ 42).

e.      The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting.  (FASB Statement of Concepts No. 2 ¶¶ 58-59).

f.      The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (FASB Statement of Concepts No. 2 ¶ 80).

- 38 -

g.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.  (FASB Statement of Concepts No. 2 ¶¶ 95, 97).

## UNDISCLOSED ADVERSE INFORMATION

80.      The market for Sirva's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Sirva's securities traded at artificially inflated prices during the Class Period.  The artificial inflation continued until at least November 9, 2004. Plaintiff and other members of the Class purchased or otherwise acquired Sirva securities relying upon the integrity of the market price of Sirva's securities and market information relating to Sirva, and have been damaged thereby.

81.      During the Class Period, defendants materially misled the investing public, thereby inflating the price of Sirva's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendant's statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

82.      At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Sirva's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of

- 39 -

Sirva and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**ADDITIONAL SCIENTER ALLEGATIONS**

83.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Sirva, their control over, and/or receipt and/or modification of Sirva's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Sirva, participated in the fraudulent scheme alleged herein.

84.     In addition, defendants were motivated to engage in the wrongdoing herein in order to allow defendants Rogers and Schnall to profit from their sales of Sirva common stock during the IPO and Secondary Offering. As discussed above in paragraph 4, entities in which defendants Rogers and Schnall had financial and controlling interests sold 6,403,476 shares in the Offering and 15,022,831 shares in the Secondary Offering (21,426,307, total), thereby giving defendants a strong incentive to create the illusion that the Company's financial performance was better than it actually was.

- 40 -

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

85.     At all relevant times, the market for Sirva's securities was an efficient market for the following reasons, among others:

(a)     Sirva's securities met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient market;

(b)     As a regulated issuer, Sirva filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     Sirva regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Sirva was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

86.     As a result of the foregoing, the market for Sirva's securities promptly digested current information regarding Sirva from all publicly available sources and reflected such information in Sirva's securities price. Under these circumstances, all purchasers of Sirva's securities during the Class Period suffered similar injury through their purchase of Sirva's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

87.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sirva who knew that those statements were false when made.

## COUNT I

### VIOLATION OF SECTION 10(b) OF
### THE EXCHANGE ACT AGAINST AND RULE 10b-5
### PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

88.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.      During the Class Period, Sirva and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sirva's securities; and (iii) cause plaintiff and other members of the Class to purchase Sirva's securities at artificially inflated prices.

- 42 -

In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

90.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Sirva's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

> In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

91.     Sirva and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Sirva as specified herein.

92.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sirva's value and performance and continued substantial growth, which included the making of, or the participation in the making of,

untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Sirva and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Sirva's securities during the Class Period.

93.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

94.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Sirva's operating condition and future business prospects from the investing

- 44 -

public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

95. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Sirva's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Sirva's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Sirva securities during the Class Period at artificially high prices and were damaged thereby.

96. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff, the other members of the Class and the marketplace known of the true financial condition and business prospects of Sirva, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased their Sirva securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

97. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

- 45 -

98.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### VIOLATION OF SECTION 20(a) OF
### THE EXCHANGE ACT AGAINST THE INDIVIDUALS DEFENDANTS

99.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.     The Individual Defendants acted as controlling persons of Sirva within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

- 46 -

102.    As set forth above, Sirva and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action and appointing plaintiff as Lead Plaintiff and his counsel as Lead Counsel for the Class and certifying him as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

- 47 -

**JURY DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:     November 24, 2004          CENTRAL LABORERS' PENSION FUND,
                                      Individually and on Behalf of all Others Similarly
                                      Situated, Plaintiff


                              By:     _____
                                      Marvin A. Miller
                                      Jennifer W. Sprengel
                                      Nyran Rose Pearson
                                      **MILLER FAUCHER AND CAFFERTY LLP**
                                      30 North Lasalle Street
                                      Suite 3200
                                      Chicago, Illinois 60602
                                      (312) 782-4880

                                      *Designated Local Counsel*

                                      Steven G. Schulman
                                      Peter E. Seidman
                                      Andrei V. Rado
                                      **MILBERG WEISS BERSHAD
                                        & SCHULMAN LLP**
                                      One Pennsylvania Plaza
                                      New York, New York 10119-0165
                                      (212) 594-5300

                                      *Counsel for Plaintiff*


- 48 -

## CERTIFICATIO    F PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Central Laborers' Pension Fund declares the following under penalties of perjury:

1.  My name is Barry McAnarney.

2.  I have reviewed the Sirva, Inc. complaint prepared by Milberg Weiss Bershad & Schulman LLP, whom I designate as counsel for Central Laborers' Pension Fund in this action for all purposes.

3.  As Executive Director of Central Laborers' Pension Fund, I have been duly authorized by Central Laborers' Pension Fund to commence litigation against Sirva, Inc. and the other defendants.

4.  Central Laborers' Pension Fund did not acquire Sirva, Inc. at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

5.  Central Laborers' Pension Fund is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

6.  Central Laborers' Pension Fund will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

7.  Central Laborers' Pension Fund has not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except: **See attached Schedule B.**

8.  Central Laborers' Pension Fund understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by its decision to serve as a representative party.

9.  Since November 25, 2003, Central Laborers' Pension Fund has made the following transactions in Sirva, Inc. and will provide records of those transactions upon request:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| See attached Schedule A | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Please use and attach additional pages if necessary.
**I declare under penalty of perjury that the foregoing is true and correct**

Executed this 2 3 day of _November_, 2004

Central Laborers' Pension Fund

By: _____

Barry McAnarney

### Schedule A
### Central Laborers' Pension Fund
### Transactions in Strva, Inc.

**Purchases:**

| DATE(1) | SHARES | SHARE COST |
|---------|--------|------------|
| 03/04/04 | 21,000 | 22.1113 |
| 04/23/04 | 6,000 | 24.4700 |
| 06/15/04 | 12,100 | 22.0000 |
| 06/18/04 | 2,200 | 22.5603 |
| 06/21/04 | 1,000 | 22.3062 |
| 06/21/04 | 400 | 22.3800 |
| 06/22/04 | 1,700 | 22.7068 |
| 06/23/04 | 300 | 23.0991 |
| 06/24/04 | 200 | 22.9488 |
| 08/12/04 | 7,700 | 19.7591 |
| 09/27/04 | 220 | 22.2367 |

**Sales:**

| DATE (1) | SHARES | SHARE PRICE |
|----------|--------|-------------|
| 10/14/04 | 6,020 | 23.7198 |

(1) All dates are settlement dates.

2

## Schedule B
## Central Laborers' Pension Fund

Central Laborers' Pension Fund et al. v. Marix Corporation et al., D. Or. 3:04cv826

In re Adolor Corporation Securities Litigation, E.D. Pa. 2:04cv01728

In re Electro Scientific Industries, Inc. Securities Litigation, D. Or. 3:03cv00404

In re FirstEnergy Corporation Securities Litigation, N.D. Ohio 05:03cv1684

In re InterCept Securities Litigation, N.D. GA 1:03-cv-03475

In re Sara Lee Corporation Securities Litigation, N.D. Ill. 1:03cv3202

In re Stellent, Inc. Securities Litigation, D. Minn. 0:03cv4384

Whalen, et al. v. Hibernia Foods, PLC., et al., S.D.N.Y. 04-CV-3182

In re Wireless Facilities, Inc. Securities Litigation, S.D.CA. 04-CV-1589

Civil Cover Sheet



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

**Plaintiff(s): CENTRAL LABORERS' PENSION FUND,**

County of Residence: Morgan County

Plaintiff's Atty: Miller Faucher and Cafferty LLP
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

**Defendant(s): SIRVA INC., et al.,**

County of Residence:

Defendant's Atty:

## 04C 7644

NOV 2 4 2004

II. Basis of Jurisdiction:    **3. Federal Question (U.S. not a party)** JUDGE RONALD GUZMAN

III. Citizenship of Principal Parties (Diversity Cases Only)     MAGISTRATE JUDGE DENLOW
Plaintiff:- **N/A**
Defendant:- **N/A**

IV. Origin :    **1. Original Proceeding**

V. Nature of Suit:    **850 Securities / Commodities / Exchange**

VI. Cause of Action:    **15 U.S.C. §§ 78j(b), 78n(a) and (e) and 78t(a)**

VII. Requested in Complaint
Class Action: **Yes**
Dollar Demand:
Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: _Nov. 23, 2004 - Nov 24, 2004_

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it.

/ -2

http://www.ilnd.uscourts.gov/PUBLIC/Forms/auto_js44.cfm                11/23/2004

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**CENTRAL LABORERS' PENSION FUND,**

v.

**SIRVA INC., et al.**

# 04C 7644

Case Number:

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Central Laborers' Pension Fund, individually and on behalf of all others similarly situated, Plaintiff

JUDGE RONALD GUZMAN

MAGISTRATE JUDGE DENLOW

| (E) | (F) |
|---|---|
| SIGNATURE *Andrei V. Rado/msm* | SIGNATURE *Nyran Rose Pearson* |
| NAME Andrei V. Rado | NAME Nyran Rose Pearson |
| FIRM Same as (A) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER / FAX NUMBER | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS npearson@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06276743 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☐ NO ☑ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☑ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☑ NO ☐ |

| (G) | (H) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER / FAX NUMBER | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

1-3

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**CENTRAL LABORERS' PENSION FUND,**

v.

**SIRVA, INC., et al.,**

**04C 7644**

Case Number:

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Central Laborers' Pension Fund, individually and on behalf of all others similarly situated, Plaintiff

JUDGE RONALD GUZMAN

MAGISTRATE JUDGE DENLOW

| (A) | (B) |
|---|---|
| SIGNATURE *Steven G. Schulman /mon* | SIGNATURE *Marvin A. Miller* |
| NAME Steven G. Schulman | NAME Marvin A. Miller |
| FIRM Milberg Weiss Bershad & Schulman LLP | FIRM Miller Faucher and Cafferty LLP |
| STREET ADDRESS One Pennsylvania Plaza | STREET ADDRESS 30 North LaSalle Street, Suite 3200 |
| CITY/STATE/ZIP New York, New York 10119 | CITY/STATE/ZIP Chicago, Illinois 60602 |
| TELEPHONE NUMBER (212) 594-5300  FAX NUMBER | TELEPHONE NUMBER (312) 782-4880  FAX NUMBER 782-4485 |
| E-MAIL ADDRESS | E-MAIL ADDRESS mmiller@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 |
| MEMBER OF TRIAL BAR?  YES ☐  NO ☑ | MEMBER OF TRIAL BAR?  YES X  NO ☐ |
| TRIAL ATTORNEY?  YES ☐  NO ☐ | TRIAL ATTORNEY?  YES X  NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?  YES X  NO ☐ |
| (C) | (D) |
| SIGNATURE *Peter E. Seidman /mon* | SIGNATURE *Jennifer W. Sprengel /mon* |
| NAME Peter E. Seidman | NAME Jennifer W. Sprengel |
| FIRM Same as (A) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER  FAX NUMBER | TELEPHONE NUMBER  FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS jsprengel@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 |
| MEMBER OF TRIAL BAR?  YES ☐  NO ☑ | MEMBER OF TRIAL BAR?  YES ☐  NO ☑ |
| TRIAL ATTORNEY?  YES ☑  NO ☐ | TRIAL ATTORNEY?  YES ☑  NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☑ | DESIGNATED AS LOCAL COUNSEL?  YES ☑  NO ☐ |

DOCKETED

NOV 24 2004