## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CENTRAL LABORERS' PENSION FUND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| SIRVA, INC., BRIAN P. KELLEY, JOAN ) | No. 04 C 7644 |
| E. RYAN, JAMES W. ROGERS, RICHARD ) | |
| SCHNALL, CARL T. STOCKER, CREDIT ) | Judge Ronald A. Guzmán |
| SUISSE FIRST BOSTON LLC, GOLDMAN ) | |
| SACHS & CO., DEUTSCHE BANK ) | |
| SECURITIES, INC., CITIGROUP GLOBAL ) | |
| MARKETS, INC., J.P. MORGAN ) | |
| SECURITIES, INC., BANC OF AMERICA ) | |
| SECURITIES LLC, MORGAN STANLEY & ) | |
| CO., INC., PRICEWATERHOUSECOOPERS ) | |
| LLP, and CLAYTON DUBILIER & RICE, ) | |
| INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff has sued SIRVA, Inc., Joan E. Ryan, Brian P. Kelley, James W. Rogers, Richard

Schnall, Carl T. Stocker, Clayton Dubilier & Rice, Inc., Credit Suisse First Boston LLC, Goldman

Sachs & Co., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities,

Inc., Banc of America Securities LLC, Morgan Stanley & Co., Inc., and PricewaterhouseCoopers

LLP pursuant to the Public Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, for their

alleged violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934. The

case is before the Court on defendants' Federal Rule of Civil Procedure ("Rule") 12(b)(6) motions

to dismiss. For the reasons set forth below, the motions of SIRVA, Ryan, Kelley, Rogers, Schnall,

Stocker, Clayton Dubilier & Rice, Credit Suisse First Boston LLC, Goldman Sachs & Co., Deutsche

Bank Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, Inc., Banc of America, Securities LLC, Morgan Stanley & Co, Inc., are granted in part and denied in part, and PricewaterhouseCoopers' motion is denied.

## Facts

SIRVA is a company that provides a variety of moving and other services. (Corrected Consol. Am. Class Action Compl. ("Compl.") ¶ 13.) The company is divided into four operating units: Relocation Solutions – North America, Relocation Solutions – Europe and Asia (collectively, "Global Relocation Solutions"), Network Services and Transportation Solutions. (*Id.* ¶ 14.) Global Relocation Solutions helps SIRVA clients relocate employees by moving household goods, assisting with the sale and purchase of homes, and arranging financing for home purchases. (*Id.* ¶ 14a.) Network Services provides insurance and other services to moving and storage agents, independent owner-operators and small fleet operators. (*Id.* ¶ 14b.) Transportation Solutions provides outsourcing services for supply chain functions like freight bill auditing and inventory management. (*Id.* ¶ 14c.)

Defendant Kelley is SIRVA's CEO, a position he has held since August 2002. (*Id.* ¶ 16.) Defendant Ryan is a former member of SIRVA's Audit Committee and served as SIRVA's CFO from February 2003 until January 21, 2005. (*Id.* ¶ 17.) Defendant Rogers is Chairman of the SIRVA Board of Directors, a position he has occupied since November 1999, and is a principal of defendant Clayton, Dubilier & Rice, Inc. ("CDR"), SIRVA's majority shareholder. (*Id.* ¶¶ 18, 30.) Defendant Schnall has been a SIRVA director since March 2002 and is also principal of CDR. (*Id.* ¶¶ 19, 30.) Defendant Stocker has been a SIRVA director since March 2000 and has served as Chairman of its Audit Committee since 2003. (*Id.* ¶¶ 20, 90.)

Defendants Credit Suisse First Boston LLC, Goldman Sachs & Co., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, Inc., Banc of America Securities LLC and Morgan Stanley & Co., Inc. (collectively, "the Underwriters") are investment banking firms that served as underwriters for SIRVA's initial and supplemental public offerings ("IPO" and "SPO"). (*Id.* ¶¶ 22-28.)

Defendant PricewaterhouseCoopers ("Price") is an accounting firm that was SIRVA's auditor during the IPO and SPO. (*Id.* ¶ 29.) Price also served as SIRVA's actuary until May 2005. (*Id.* ¶ 94.)

Plaintiff is a union pension fund that purchased SIRVA common stock pursuant to the IPO and SPO. (*Id.* ¶ 12.)

On November 25, 2003, SIRVA conducted its IPO. (*Id.* ¶ 34.) In connection with that offering, SIRVA filed a prospectus and registration statement with the SEC that was signed by defendants Kelley, Ryan, Rogers, Schnall and Stocker. (*Id.*) The prospectus included audited financial statements for the years 2001 and 2002, unaudited financial statements for the nine months ending September 30, 2003 and a favorable audit opinion by Price. (*Id.* ¶¶ 41-42.)

Plaintiff says that the prospectus contains numerous misstatements concerning, among other things, the health and potential of the company's European business, the company's accounting practices and financial results, and the method by which it calculated insurance reserves. (*Id.* ¶¶ 37-40, 43-46.)

Plaintiff alleges that Kelley, Ryan and Rogers knew that there were problems with the European business long before the IPO because a former senior European finance executive told them that the unit could not meet its budget and was "experiencing declining demand, revenue shortfalls, an inability to further cut costs and an inability of acquisitions to perform up to

3

expectations." (*Id.* ¶¶ 102-03.) Plaintiff says that defendants knew the statements about their accounting practices and their financial results were false because they did not conform to Generally Accepted Accounting Principles. (*Id.* ¶¶ 359-89.) Plaintiff also alleges that defendants knew the statements about SIRVA's reserves methodology were false because they manipulated the reserves to boost earnings and Price told them in June and December 2003 that certain insurance lines were under-reserved. (*Id.* ¶¶ 137-70.)

On June 10, 2004, SIRVA conducted its SPO. (*Id.* ¶ 54.) Again, SIRVA filed a prospectus and registration statement with the SEC that was signed by Kelley, Ryan, Rogers, Schnall and Stocker. (*Id.*) Plaintiff alleges that the misstatements defendants made in the IPO prospectus were repeated in the SPO prospectus. (*Id.* ¶¶ 56-63.)

Defendants' misstatements, plaintiff says, were not limited to the prospectuses. According to plaintiff, during the first nine months of 2004, defendants also made false statements about the European operations, SIRVA's accounting practices and financial results and its insurance reserves in press releases, conference calls with securities analysts, SEC filings and its 2003 Annual Report to shareholders. (*Id.* ¶¶ 231-303, 318-22.)

On November 9, 2004, SIRVA announced that it had to take a $15.2 million charge to increase insurance reserves, a development that Kelley attributed to an increase in losses and SIRVA's change in actuarial firms. (*Id.* ¶¶ 304-09.) SIRVA also said it was scaling back its 2004 earnings guidance by approximately thirty-two cents per share. (*Id.* ¶ 305.) The following day, SIRVA's stock price dropped from $23.78 to $17.95 per share. (*Id.* ¶ 312.)

On January 21, 2005, CFO Ryan resigned from the company, effective immediately. (*Id.* ¶ 325.) According to a letter sent to Price on her behalf, Ryan was asked to leave because of her insistence on accurate financial reporting. (*Id.* ¶ 354.)

4

Ten days later, SIRVA announced that it might have to restate its financials and was reviewing whether its accounting had any material weaknesses. (*Id.* ¶¶ 327-28.) That announcement caused the price of SIRVA stock to drop from $14.40 to $8.86 per share. (*Id.* ¶ 329.)

On March 10, 2005, SIRVA announced that its financial statements for the years 2001-2003 and the first three quarters of 2004 would have to be restated because the company had to take a $22 million charge due to twelve accounting errors it had identified. (*Id.* ¶ 335.)

On June 20, 2005, SIRVA revised its estimate of the accounting errors charge from $22 million to $27 million. (*Id.* ¶ 339.)

On September 21, 2005, SIRVA filed its 2004 Form 8-K with the SEC. (*Id.* ¶ 347.) In that Form, the company admitted that it had material weaknesses in its internal control over financial reporting and identified twelve errors that lead to a $34 million overstatement of the company's pre-tax income for the years 2000 through the first nine months of 2004. (*Id.* ¶¶ 347-48.)

## Discussion

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiffs' favor. *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## I. The Underwriters' Motion

### A. Count I - Standing

In Count I, plaintiff charges the Underwriters with violating section 11 of the Securities Act of 1933. Section 11 holds underwriters liable for damages sustained by those who purchased stock pursuant to a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). The Underwriters say these claims must be dismissed because: (1) plaintiff has no standing to pursue them; and, even if it does, (2) none of the allegedly false statements was material; and (3) it cannot satisfy the damage element of the claims related to the IPO.

It is not clear whether the Underwriters contend that plaintiff lacks Article III standing to pursue these claims or does not fall within the class of investors covered by the statute. To the extent it is the former, their motion must be denied. Plaintiff has standing under Article III if it suffered a "concrete and particularized" injury that is fairly traceable to defendants' conduct and is likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted). Plaintiff alleges that it purchased SIRVA stock at an inflated price because of the misstatements in the offering documents, an economic injury that a lawsuit could redress. Thus, plaintiff has constitutional standing to assert its section 11 claims.

Whether it falls within the class of persons entitled to sue under that section is a different, and non-jurisdictional, question. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998) (noting that whether plaintiff has a cause of action under the statute is a "merits inquiry," and whether a plaintiff has "[a] remediable injury in fact," is a question of Article III standing). Though the Seventh Circuit has yet to address the issue, other circuit courts of appeal have interpreted section

6

11 as providing a cause of action to investors who purchase stock in an offering and "aftermarket purchasers who can trace their shares to an allegedly misleading registration statement." *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003); *see Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873 (5th Cir. 2003) (same); *Joseph v. Wiles*, 223 F.3d 1155, 1160 (10th Cir. 2000) (same); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999) (same). Plaintiff has alleged that it purchased SIRVA stock "issued pursuant or traceable to the November 25, 2003 IPO and/or June 10, 2004 SPO." (Compl. ¶ 64.) At this stage of the proceedings, that allegation is sufficient to put plaintiff in the class of investors covered by section 11. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3rd Cir. 1992) (allegation that plaintiff purchased the shares "pursuant to the [offering]" held sufficient to defeat motion to dismiss section 11 claim); *Danis v. USN Comms., Inc.*, 73 F. Supp. 2d 923, 931 (N.D. Ill. 1999) (holding that plaintiff need only allege that his injury is traceable to challenged registration to maintain section 11 claim); *Cf. In re LILCO Sec. Litig.*, 111 F.R.D. 663, 671 (E.D.N.Y. 1986) ([T]racing is a question of fact reserved for trial.").

## B. Materiality

The Underwriters also argue that plaintiff cannot satisfy the material misstatement element of their section 11 claims. A misstatement or omission is material if "under all the circumstances, the omitted fact or the prediction without a reasonable basis is one that a reasonable investor would consider significant in making the decision to invest, such that it alters the total mix of information available about the proposed investment." *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1404 & 1405 n.11 (7th Cir. 1995) (quotation omitted). Plaintiff alleges that the IPO and SPO prospectuses misstated or failed to disclose material information about SIRVA's European business,

7

its insurance reserves, and its accounting practices and financial results. The Court will address each category in turn.

### 1. European Business

According to plaintiff, defendants failed to disclose various problems SIRVA was having with its European business, including: its failure to meet internal budget projections, the decline in demand for its services, its inability to cut costs further, and the poor performance of the companies it had acquired. (*See* Compl. ¶¶ 37, 63.) In addition, plaintiff says the prospectuses contained the following misstatements:

> We intend to increase our market share internationally as we continue to develop our global relocation solutions platform. We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development. We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia.

and

> Historically, a majority of our operating revenues and income from operations was derived from our moving services businesses. A significant element of our growth model, however, is our new and unproven strategy of offering a global comprehensive relocation solution to customers by combining our higher margin relocation services with our proprietary moving services network. We embarked on this strategy less than two years ago with the acquisition of the business of Cooperative Resources Services, Ltd., and have not yet proven that it will succeed in the long-term, especially in Europe and Asia.

(*Id.* ¶¶ 38-39, 63.)

Boiled down, the Underwriters say, the first omissions claim is just a complaint that defendants did not disclose SIRVA's internal profit projections for 2004 for its European operations. Because there is no duty to disclose such projections, *see, e.g., In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993), the Underwriters say this claim must be dismissed.

8

The Court disagrees. Plaintiff does not contend that defendants should have disclosed SIRVA's internal projections about the future profits of its European operations. Rather, it says that defendants should have revealed that SIRVA's European operations had fallen short of internal profit projections in both 2002 and 2003. (Compl. ¶¶ 102-03.) Those are facts about past performance, not projections about future performance. As a result, that information is not exempt from disclosure. *Verifone*, 11 F.3d at 869 (stating that "financial data or other existing facts from which forecasts are typically derived" are not exempt).

The next question is whether that information is material; that is, whether "a reasonable investor would consider [it] significant in making the decision to invest." *Harden*, 65 F.3d at 1404. At least one court has said no, because: (1) internal estimates are generally prepared using more aggressive assumptions than estimates intended for the public; (2) "internal estimates . . . necessarily change over time" and are "invariably wrong"; and (3) "a comparison of actual and internally[-]predicted results does not [bear on] the truthfulness of the actual results." *Saddle Rock Partners, Ltd. v. Hiatt*, No. 95-2326 GA, 1996 WL 859986, at *9-11 (W.D. Tenn. Mar. 26, 1996).

That may be true, but in this case, the budget shortfalls are only half of the story. The other half is that the shortfall was trending upward. In 2002, the European operations fell $3.5 million short of budget. By 2003, that number had climbed to $7 million. (Compl. ¶¶ 102-03.) That trend could suggest any number of things – that demand was falling, costs were increasing, the European operations were poorly managed or SIRVA management set unrealistic budgets – any of which a reasonable investor could arguably consider significant. Given the possible implications of the budgetary shortfalls in this case, the Court cannot say as a matter of law that they are immaterial.

9

The same is true for the other information plaintiff says SIRVA withheld, that demand for its services in Europe was declining, it could not cut costs in those operations any further and the European businesses it had acquired were underperforming. The financial statements in the IPO prospectus indicate that SIRVA increasingly relied on its European operations for its total operating revenues and income. By the end of 2003, those operations accounted for more than twenty percent of SIRVA's total operating revenues and more than a quarter of its income. (*See* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 2, 31; *id.*, Ex. 8, SPO Prospectus at 2, 23.)[1] Moreover, SIRVA specifically identified cutting costs and acquiring other companies as two of its strategies for increasing its revenues. (*Id.*, Ex. 1, IPO Prospectus at 5; *id.*, Ex. 8, SPO Prospectus at 5.) Given the importance of the European operations to SIRVA's bottom line and its stated strategies for increasing revenues from them, the Court cannot say, as a matter of law, that no reasonable investor would consider the alleged omissions immaterial to an investment decision.

Plaintiff also contends that defendants made the following affirmative misstatements about SIRVA's European operations: "We intend to increase our market share internationally"; "We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development"; and "We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia." (Compl. ¶ 38; *see* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 4; *id.*, Ex. 8, SPO Prospectus at 4-5.) Plaintiff does not allege that those

---

[1]"[I]n securities actions, the court may . . . rely on public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit without, pursuant to Rule 12(b), converting the motion into one for summary judgment." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (quotation and citation omitted).

statements are literally false, *i.e.*, that SIRVA did not intend to increase its international market share, did not believe the international opportunities were considerable and did not have a leading market share in Europe. But it says they are actionable because they are misleading in light of the material facts defendants did not disclose about the European operations: declining demand, revenue shortfall, an inability to cut costs, and the failure of acquisitions to perform up to expectations. (Compl. ¶ 37.)

The Underwriters say those statements are not actionable under any circumstances because they are simply puffery. *See Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (stating, in the context of section 10(b), that "promotional phrase[s] . . . devoid of any substantive information," "indefinite predictions of 'growth,'" and optimistic statements that "lack[] . . . specificity" are immaterial as a matter of law). The Court agrees. The contested statements about the European operations are just the kind of vague, optimistic statements held not to be actionable in *Searls*. *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam) (statements that company "would not compromise its financial integrity," was "commit[ed] to creat[ing] earnings opportunities" and was using "business strategies [that] would lead to continued prosperity" held to be non-actionable puffery); *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 428-29 (D.R.I. 1996) ("[W]e are gaining market share, we are gaining momentum, and our revenues are strong," and the company has "good opportunities to expand its products offerings" held to be puffery).

Finally, plaintiff alleges that defendants misled investors about the company's prospects, by saying that its "growth model" was largely based on its "new and unproven strategy of offering a global comprehensive relocation solution to customers," a strategy that was less than two years old and might not "succeed in the long-term, especially in Europe and Asia." (Compl. ¶ 39; Exs.

11

SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 14; *id.*, Ex. 8, SPO Prospectus at 11.) Defendants contend that this statement cannot be actionable because it cautions investors about investing rather than enticing them to do so. Plaintiff says this is a caveat in appearance only because defendants knew at the time of the IPO that its strategy was a failure in Europe. Whether that is true depends on a number of facts that cannot be determined on a motion to dismiss, among them: the length of time a strategy has to be in place before it can be deemed a success or a failure, whether defendants believed the European business would improve over time or thought it was in a downward spiral, and whether defendants were aware of any characteristics of or constraints on the European market that would negatively impact its strategy. Until those facts, are resolved, this claim cannot be dismissed.

### 2. Insurance Reserves

Plaintiff also alleges that defendants manipulated SIRVA's insurance reserves to inflate its earnings. (*See* Compl. ¶¶ 137-70.) That conduct, plaintiff says, rendered the following prospectus statements untrue, that: (1) SIRVA's reserve rates are "based on a percentage of earned premium[, which, in turn,] is based on historical data, run rates and actuarial methods"; (2) reserves for cargo claims are analyzed quarterly and changes to them are made "as appropriate"; and (3) reserves are "based upon past claims experience, knowledge of claims staff regarding the nature and potential cost of each claim and trends and estimates of future claims trends." (*Id.* ¶¶ 44-45, 137; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 37, 77; *id.*, Ex. 8, SPO Prospectus at 28, 67.)

The Underwriters say that all of these statements relate to reserves for cargo claims, which are not addressed in plaintiff's reserve manipulation allegations. The Court disagrees. Only the second statement is specifically limited to cargo claims. The others are statements about SIRVA's reserve methodology, generally.

The Underwriters are correct, however, that plaintiff does not allege that defendants manipulated reserves for cargo claims. Rather, plaintiff alleges that defendants manipulated reserves for claims made on National Association of Independent Truckers ("NAIT") policies and workers' compensation policies. (See Compl. ¶¶ 153-55, 162-63, 166-68.) Because plaintiff has not alleged that defendants manipulated reserves for cargo claims, it cannot base a section 11 claim on prospectus statements about those reserves.

The remaining reserves manipulation claims are based on information from: (1) a "Former TransGuard Finance Executive,"a "Former NAIT Claims Manager," and a "Former NAIT Claims Supervisor," who reported that: (a) Dan Briody, Vice President of NAIT, would "actively push reserves downward" during large loss meetings; and (b) Price, which was serving as the company's actuary, concluded in June 2003 that SIRVA's workers' compensation line was under-reserved by up to $2 million (id. ¶¶ 145, 153, 162); (2) a "Former TransGuard Supervisor of Insurance Accounting" who said that "they would adjust reserves here and there" in order to "make the numbers" (id. ¶ 166); (3) a "Former TransGuard General Accounting Manager" who said Gary Jinx, then-head of accounting for TransGuard reserves, told him in March 2004 that the workers' compensation line was under-reserved by $4 to $5 million (id. ¶ 167); and (4) a "Former SIRVA Executive of Pricing" who said that "[i]t was widely known that we were going to take a big hit to reserves" (id. ¶ 170).

13

Those allegations are insufficient under the PSLRA. Though the statute permits plaintiff to rely on confidential sources to defeat a motion to dismiss, it must describe those sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged . . . , or in the alternative provide other evidence to support [its] allegations." *Makor Issue & Rights, Ltd. v. Tellabs*, 437 F.3d 588, 596 (7th Cir. 2006) (citation and quotation omitted). Plaintiff has offered no other evidence in support of the reserve manipulation claim. Thus, it must allege sufficient detail about the sources to suggest that they would have the information they report.

Plaintiff has not satisfied that standard with respect to any of its confidential sources. Plaintiff does not generally allege any of the sources' job duties or the dates of their employment. Moreover, with the exception of the Former TransGuard General Accounting Manager, plaintiff has not alleged how the sources obtained the information they report. Plaintiff does not explain whether the sources have personal knowledge of the alleged reserves manipulation or if they know that Kelley and Ryan actually received and read the documents that disclosed the manipulation and, if so, how. Nor does plaintiff explain how the Former TransGuard Supervisor of Insurance Accounting knew reserves were being adjusted "here and there," when such adjustments occurred, in which lines of insurance the adjustments were made or who was doing the adjusting. Similarly, plaintiff does not explain the basis for the assertion by the Former SIRVA Executive of Pricing that "[i]t was widely known that we were going to take a big hit to reserves." Without further support, plaintiff's reserves manipulation claims do not pass muster under the PSLRA. *See Calif. Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3rd Cir. 2004) (dismissing section 10(b) claim premised on information from confidential sources because plaintiffs did not allege when the sources

14

were employed by defendant, the dates the sources obtained the alleged information, or how they had access to such information).

### 3. Accounting Practices

The last category of statements plaintiff challenges are those pertaining to SIRVA's accounting practices. Specifically, plaintiff alleges that the financial results defendants' reported in the prospectuses were false because the company: (1) failed to take a timely charge to accrue additional liabilities related to its multiple-line property and commercial liability insurance; (2) improperly overstated premium revenue and commission income; (3) improperly accounted for accrued expenses; (4) improperly accelerated revenue related to corporate and referral fees; (5) improperly accounted for home inventory valuation reserve; and (6) failed to establish and maintain adequate internal accounting controls. (Compl. ¶¶ 40, 47.)

The Underwriters contend that these errors, to which SIRVA admitted in the Form 8-K it filed in September 2005, did not materially impact the financial information in the prospectuses. In fact, the Underwriters say, but for the accounting errors, SIRVA's cumulative net income for the years 2000 through the first three quarters of 2003, would have been higher than what was reported in the prospectuses. Because the actual numbers were higher than the numbers reported in the prospectuses, the Underwriters say the errors were immaterial as a matter of law.

The Underwriters' argument assumes that cumulative net income is the only figure an investor would find important in making the decision to invest. Whether that is true is a factual question that cannot be resolved on a motion to dismiss.

15

Moreover, the increase in cumulative net income notwithstanding, the impact of the restatement on SIRVA's financials was not wholly positive. Though the restatement effected a $11.7 million increase in SIRVA's net income for 2002, it effected a $5.8 million increase in the net loss SIRVA sustained in 2001. (*Compare* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 7, 9/21/05 10-K at 34 *with id.*, Ex. 1, IPO Prospectus at 8 & Ex. 8, SPO Prospectus at 7.) In addition, in the restatement SIRVA admitted that there were "material weaknesses in [its financial reporting] control environment, organizational structure and in [its] consistent application of GAAP [Generally Accepted Accounting Principles]." (*Id.*, Ex. 7, 9/21/05 Form 10-K at 41.) A material weakness, SIRVA explained, "is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." (*Id.* at 185.) Because it is arguable that a reasonable investor would find such information relevant to his investment decision, the section 11 accounting practices claim cannot be dismissed.

## C. Damage Related to the Offerings

Next, the Underwriters argue that plaintiff cannot state a section 11 claim in connection with either the IPO or the SPO because it did not suffer any damage that is traceable to those offerings. According to the statute, plaintiff was damaged if the price of the stock was higher on the date plaintiff purchased it than on the date plaintiff filed suit. *See* 15 U.S.C. § 77k(e) ("[D]amages represent the difference between the amount paid for the security . . . and the value thereof as of the time [the] suit was brought"). There is no dispute that plaintiff paid less for its SIRVA stock than it was fetching on November 24, 2004, the date plaintiff filed this suit. (*Compare* Initial Compl.,

16

Certification Proposed Lead Pl., Schedule A, *with* http://online.wsj.com/public/us (enter "SIR" in "Quotes & Research"; then enter 11/24/04 in "Historical Quotes" date).)[2] Plaintiff did not, however, assert a section 11 claim in its initial complaint.

That fact, the Underwriters say, is irrelevant. In their view, plaintiff's section 11 claims relate back to the initial complaint because they arise from the same "conduct, transaction, or occurrence" as the claims set forth in it. *See* FED. R. CIV. P. 15(c)(2); (Compl. ¶¶ 5-7, 33-38, 53-58 (asserting violations of section 10(b) of the Exchange Act and Rule 10b-5 based on, among other things, the alleged misrepresentations in the offering documents); *id.* ¶¶ 37-41, 56-63 (alleging section 11 claims grounded in the same conduct).) Thus, the Underwriters contend that the Court should deem the section 11 claims to have been filed on November 24, 2004, the date plaintiff filed suit.

In support of their argument, the Underwriters cite *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525 (8th Cir. 1996). As in this case, the plaintiff in *Alpern* filed an initial complaint asserting claims under section 10(b) and later amended the complaint to assert a section 11 claim. *Id.* at 1543. Because the stock price was higher on the date Alpern filed the section 11 claim than it was when he purchased it, the district court entered summary judgment for the defendant on the section 11 claims. *Id.* at 1541-43. Alpern appealed, arguing that the section 11 claims related back to the original filing date. *Id.* at 1542.

The Eighth Circuit agreed:

> Alpern's § 11 claim was based on the same misappropriations alleged in the original complaint . . . . Both his [section 10(b) and section 11] claims asserted that he was unaware of the misappropriations and that UtiliCorp artificially inflated its stock

---

[2]The Court "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).

17

prices by disseminating materially misleading statements and/or omitting to state material facts necessary to make its statements not misleading.

Other considerations also favor the relation back of the amended complaint. . . . Nothing suggests that Alpern sought to capitalize on a further drop in stock prices by waiting for a more favorable date to file his § 11 claim. Rather, he amended his claim less than two months after filing his initial complaint based on additional information discovered about the same underlying occurrences. Since Alpern was a DRIP plan purchaser, Utilicorp also should not have been surprised that Alpern sought to hold it accountable for its statements related to the DRIP prospectus. Finally, it is unlikely that UtiliCorp's defense on the merits will be unfairly prejudiced, and it may also assert reasonable inquiry and good faith belief defenses against a § 11 claim. Under the circumstances Alpern's amended complaint relates back to the filing date of the original complaint under Rule 15(c)(2).

*Id.* at 1543-44.

The Underwriters ask this Court to follow *Alpern* and apply Rule 15(c) to plaintiff's section 11 claims. But there is an important difference between *Alpern* and this case. In *Alpern*, the plaintiff asked the court to apply the relation-back doctrine to save his section 11 claim. In this case, defendants ask the Court to use the doctrine to *defeat* plaintiff's claims. Defendants have not cited, and the Court has not found, any case in which the relation-back doctrine was used to bar claims. Moreover, applying the doctrine in that manner would defeat its purpose, which is to allow plaintiffs to assert time-barred claims as long as defendants have sufficient notice of their exposure. *See Kansa Reins. Co., Ltd. v. Congressional Mortgage Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994) (stating that the purpose of Rule 15(c) is "to allow a party to amend an operative pleading despite an applicable statute of limitations in situations where the parties to litigation have been sufficiently put on notice of facts and claims which may give rise to future, related claims"). Applying the doctrine as the Underwriters urge would, in effect, shorten the statute of limitations on plaintiff's section 11 claims, not lengthen it, as Rule 15 contemplates.

18

Even if it might be appropriate to apply the doctrine in this manner in some cases, the facts of this case show that this is not one of them. Though SIRVA announced in November 2004 that it needed to take a $15.2 million charge to reserves, Kelley attributed that development to increased losses and a change in actuaries. (Compl. ¶¶ 304-09.) It was not until the end of January 2005 that the company announced it might have to restate its financials and was reviewing whether its accounting had any material weaknesses. (*Id.* ¶¶ 327-28.) Moreover, the final decision to restate was not announced until March 2005, and SIRVA did not identify the actual accounting errors it had discovered until September 2005, nearly a year after plaintiff filed its initial complaint. (*Id.* ¶¶ 335, 347-48.) As a result, relating the section 10(b) claims back to the original filing date, would divest plaintiff of claims about which it could not reasonably have known when it filed the suit.

In short, given the dearth of authority supporting the Underwriters' request and its tension with the purpose of the Rule and the facts of this case, the Court declines to relate plaintiff's section 11 claims back to the date the initial complaint was filed.

Plaintiff first asserted its section 11 claims in the amended complaint filed October 11, 2005. On that day, SIRVA stock was selling for $6.57 per share. (*See* http://online.wsj.com/public/us (enter "SIR" in "Quotes & Research"; then enter 10/11/05 in "Historical Quotes" date).) Plaintiff paid $22.11 and $24.47 per share, respectively, for the shares it bought after the IPO. (*See* Initial Compl., Certification Proposed Lead Pl., Schedule A.) Because plaintiff paid more for its IPO shares than they were worth on the day it filed its section 11 claims, plaintiff satisfies the damage element of those claims.

The Underwriters also say that plaintiff cannot trace its post-SPO stock purchases to that offering. Plaintiff's PSLRA certification shows that it purchased 25,820 shares in the aftermarket

19

on nine separate occasions between June 15, 2004 and August 27, 2004. (*See* Initial Compl., Certification Proposed Lead Pl., Schedule A.) On the last eight of those dates, the Underwriters say, SPO stock mingled in the market with IPO stock and the stock of corporate insiders. Thus, they conclude, "[p]laintiff cannot possibly prove that the securities it bought after the SPO are directly traceable to an allegedly false registration statement." (Underwriters' Mem. Law. Supp. Mot. Dismiss at 10.)

That may be true, but at this stage of the litigation, plaintiff does not have to *prove* anything. It simply has to allege that it purchased stock that is traceable to the offerings. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 n.7 (3rd Cir. 2006) (stating that "plaintiffs need not prove their shares are traceable to a false or misleading registration statement" to defeat a motion to dismiss and holding that allegations that plaintiffs purchased stock "'in' and 'traceable to' the . . . stock offerings were sufficient"). Plaintiff has made the requisite allegations. (*See* Compl. ¶ 74.)

## Count II

In Count II, plaintiff alleges that defendants violated section 12(2) of the 1933 Act, which imposes liability on any person who offers or sells stock in interstate commerce pursuant to a prospectus or oral communication that "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. § 77l. However, standing under this section is limited to those who purchase stock pursuant to public offerings, which plaintiff admits it did not do. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 566 (1995); (Compl. ¶¶ 34, 54 (alleging that IPO and SPO were November 25, 2003 and June 10, 2004,

20

respectively); Initial Compl., Certification Proposed Lead Pl., Schedule A (showing that plaintiff made no purchases on those dates).)

Plaintiff says that is irrelevant because, as lead plaintiff in this PSLRA suit, it is not required to have standing as to every claim in the suit. While that is true, *see, e.g., Hevesi v. Citigroup, Inc.,* 366 F.3d 70, 82 (2d Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action."), there must be least one named plaintiff who does have standing to sue as to every claim. *See id.* at 83 (stating that additional named plaintiffs who have standing lead plaintiff lacks can be appointed to assist lead plaintiff in representing the class); *Payton v. County of Kane,* 308 F.3d 673, 682 (7th Cir. 2002) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action."); *Ong ex rel. Ong IRA v. Sears, Roebuck & Co.,* 388 F. Supp. 2d 871, 891-92 (N.D. Ill. 2004) (dismissing certain section 12(2) claims because none of the named plaintiffs had purchased securities in those offerings). Because plaintiff is the only named plaintiff in this suit, Count II must be dismissed for lack of standing.

## II. The SIRVA Defendants' Motions

### Count I

In Count I, plaintiff seeks to hold SIRVA, Kelley, Ryan, Rogers, Schnall and Stocker liable for violating section 11 of the 1933 Act. The arguments advanced by these defendants for the dismissal of the Count I claims are the same as those advanced by the Underwriters. Thus, for the reasons discussed above, the SIRVA defendants' motions to dismiss the Count I claims is granted in part and denied in part.

21

**Count II**

In Count II, plaintiff alleges that SIRVA is liable for violating section 12(2). Because the Court has determined that this count must be dismissed for lack of standing, we need not address the SIRVA defendants' arguments with respect to it.

**Count IV[3]**

In Count IV, plaintiff contends that SIRVA, Kelley, Ryan, Rogers, Schnall, Stocker and CDR ("the SIRVA defendants") violated section 10(b) of the 1934 Act and Rule 10b-5 (collectively, "section 10(b)") by making false statements or failing to disclose material facts about: (1) the health of SIRVA Europe; (2) the calculation of SIRVA's insurance reserves and (3) SIRVA's accounting practices and earnings projections. In addition, plaintiff alleges that CDR violated section 10(b) by trading on inside information. Section 10(b) prohibits the use of "any device, scheme, or artifice to defraud" or the making of "any untrue statement of a material fact" or omission of a material fact by "the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange." 17 C.F.R. § 240.10b-5; *see* 15 U.S.C. § 78j (prohibiting the "use . . . in connection with the purchase or sale of any security registered on a national securities exchange . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe"). To state a section 10(b) claim, plaintiff must allege that: each defendant made a false statement of, or failed to disclose, a material fact; they did so with scienter and in connection with the purchase or sale of securities; plaintiff relied on the

_____

[3]Because each defendant's liability on Count III depends on their liability on Count I's section 11 claims, the Court addresses Count IV first.

22

statement or the omission or the integrity of the market, and was damaged as a result. *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 250 (1988); *Tellabs*, 437 F.3d at 595. Such claims are also subject to the

pleading requirements of the PSLRA:

> Under the PSLRA, a securities fraud complaint must (1) specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. In other words, plaintiffs must not only plead a violation with particularity; they must also marshal sufficient facts to convince a court at the outset that the defendants likely intended to deceive, manipulate, or defraud.

*Tellabs*, 437 F.3d at 594-95 (quotations and citations omitted).

## A. European Operations

### 1. Materiality

The first category of misrepresentations plaintiff says defendants made concern SIRVA's

European operations. Plaintiff alleges that, like the Underwriters, the SIRVA defendants misstated

material facts in, or deliberately withheld such facts from the prospectuses, including that:

> (1) SIRVA intended to increase its European market share, believed the opportunities there were considerable and was approaching them from a position of strength;
>
> (2) the European business had failed to meet internal budget projections; and
>
> (3) demand was declining, no further cost cutting was feasible, and the European businesses SIRVA had acquired were underperforming. (Compl. ¶ 38; *see* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 4; *id.*, Ex. 8, SPO Prospectus at 4-5.)

In addition, plaintiff alleges that the SIRVA defendants made the following misrepresentations of

material facts:

23

(4) in a February 10, 2004 conference call with securities analysts, Ryan said: "[W]ith our capabilities in place in Europe, we are now in a position to drive real, organic growth in 2004." (Compl. ¶ 233);

(5) in an April 27, 2004 press release regarding the company's results for the first quarter of 2004, Kelley said: "[W]e made significant progress in broadening our services offering and expanding our presence throughout the European continent." (*Id.* ¶ 252);

(6) in an April 27, 2004 conference call with securities analysts, Kelley said that SIRVA Europe was "generating organic growth through [cross] selling relocation and moving services to our corporate clients. We're quickly integrating and growing acquisitions and as always, we're sharply focused on costs, productivity and quality." (*Id.* ¶ 255);

(7) in the same conference call, when an analyst asked Kelley, "[W]hat are you guys doing exactly in Europe that is allowing you to get these margins up so quickly. Is it Scanvan? Did they come in with a better margin than anticipated or is this just blocking and tackling?"

Kelley responded: "It is blocking and . . . tackling, Chris. It is looking at all of the operations we have across the UK and the continent. It's looking at how do we continue to wring costs out of this and wring efficiency [and] productivity out of it and do it in a way that is better and do it on an ongoing basis. This effort has been going on for 12 months, 18 months, and we anticipate that we will continue to be able to do this. If we look at this, we talked a little bit about Europe, we want to be able to continue to take the cost out, rip the cost out, make sure that we've got an efficient model so that we can invest in the front end. Invest in selling and marketing so we can grow the business. And that is basically what we have done. We have invested a significant amount on sales and marketing there. We had to have the cost reduction in order to do that and get the productivity to do that. So, that is what you're seeing in Europe." (*Id.* ¶ 258);

(8) in an August 4, 2004 press release Kelley said: "We continue to invest in our European and Asia Pacific operations with the goal of developing a powerful selling and marketing capability across the rest of the world like we have in the U.S." and "We are building the infrastructure for future growth." (*Id.* ¶ 287).

As discussed above, the statements in the second category are material, but the statements in the first category are not. Consequently, the latter statements cannot be the basis for a section 10(b) claim.

Nor can the alleged misstatements in the fourth, fifth and eighth categories. Ryan's statement that SIRVA was "in a position [in Europe] to drive real, organic growth in 2004" is an "indefinite prediction[] of 'growth,'" and Kelley's statements that SIRVA "made significant progress in broadening [its] services offering and . . . presence" in Europe, "continue[d] to invest in [the] European . . . operations" and was "building the infrastructure for future growth" are vague statements of optimism, both of which are immaterial puffery. *See Searls*, 64 F.3d at 1066.

The situation is different for the third category, which concerns defendants' failure to disclose in the prospectuses that there were demand, cost reduction and acquisition problems in Europe. With respect to these problems, plaintiff alleges that a "Former Senior European Finance Executive" personally told Kelley and Ryan in a meeting that occurred in October 2003 at SIRVA's "Centre of Excellence" in the United Kingdom and in another that occurred on December 12, 2003 at the Chelsea Royal Hospital that demand was falling in Europe, no further cost reductions could be made and the European companies SIRVA had acquired were performing poorly. (Compl. ¶¶ 98, 100-03, 106-07.) Plaintiff also alleges, through a "Former SIRVA Relocation Business Development Executive," that at a February 2004 "Summit Meeting" in Florida, Kelley said "the European operations were losing money" and "Europe was bringing the Company down." (*Id.* ¶¶ 109-10, 113.) Moreover, plaintiff says this information was material because: (1) the financials in the prospectuses demonstrated that the company's bottom line had become increasingly dependent on the European operations which, by the end of 2003, accounted for more than a quarter of its income (*see id.* ¶37; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 2, 31; *id.*, Ex. 8, SPO Prospectus at 2, 23); and (2) SIRVA specifically identified cost cutting and corporate acquisitions as strategies for increasing its revenues (*id.*, Ex. 1, IPO Prospectus at 5; *id.*, Ex. 8, SPO

Prospectus at 5). Those allegations are sufficient to satisfy the materiality element as modified by the PSLRA.

The materiality element is also satisfied with respect to the sixth and seventh categories of alleged misrepresentations. In the April 27, 2004 conference call, Kelley is alleged to have said that SIRVA Europe was "quickly integrating and growing acquisitions" and owed its profitability, both current and anticipated, to "wring[ing] costs . . . efficiency [and] productivity" out of the operation. Given the company's alleged reliance on its European operations, the Court cannot say as a matter of law that these statements are immaterial.

## 2. Scienter

The next question is whether plaintiff has sufficiently alleged the scienter element as to each defendant. *See Tellabs*, 437 F.3d at 603 ("[P]laintiffs must create th[e] inference [of scienter] with respect to each individual defendant in multiple defendant cases."). Defendants say scienter is lacking because plaintiff has not alleged that any of them had a motive to mislead investors. Motive is not, however, a prerequisite to scienter:

Currently three different approaches toward the way to demonstrate the required "strong inference [of scienter]" exist among the courts of appeals. The Second and Third Circuits take the position that . . . plaintiffs may . . . state a claim by pleading either motive and opportunity or strong circumstantial evidence of recklessness or conscious misbehavior. The Ninth and Eleventh Circuits disagree, believing that Congress opted instead for a more onerous burden. The remaining six circuits that have considered this issue take a middle ground, reasoning that Congress chose neither to adopt nor reject particular methods of pleading scienter – such as alleging facts showing motive and opportunity – but instead only required plaintiffs to plead facts that together establish a strong inference of scienter. . . . [W]e conclude that the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference. Motive and

opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient.

*Id.* at 601 (citations, quotations and alterations omitted) .

The *Tellabs* court also rejected defendants' argument that the scienter element is satisfied

only if the most reasonable inference from the alleged facts is that defendants acted with fraudulent

intent:

> The Sixth Circuit has said that the strong inference requirement creates a situation in which plaintiffs are entitled only to the most plausible of competing inferences, but that it does not mandate that the inference be irrefutable. As the Sixth Circuit itself has hinted, however, this standard could potentially infringe upon plaintiffs' Seventh Amendment rights.

> While we express no view on whether the Sixth Circuit's approach is in fact unconstitutional, we think it wiser to adopt an approach that cannot be misunderstood as a usurpation of the jury's role. Instead of accepting only the most plausible of competing inferences as sufficient at the pleading stage, we will allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent.

*Id.* at 601-02 (citation and quotation omitted). With these standards in mind, we will examine

plaintiff's allegations.

Plaintiff argues that Kelley's scienter can be inferred from the alleged fact that he knew about

the problems with the European operations and the company's increasing dependence on them,

before he misrepresented or withheld material facts. In other words, plaintiff alleges that Kelley

made public statements or disseminated information about the European business that he knew were

untrue or materially incomplete. Those allegations are sufficient to support a reasonable inference

that Kelley acted with scienter when he failed to disclose the problems with the European operations

in the prospectuses and gave purportedly inaccurate information about them in the April 27, 2004

conference call.

We turn now to Ryan. Having determined that her alleged statement in the February 10, 2004 conference call with the analysts is puffery, the section 10(b) claim against Ryan with respect to Europe rests only on the alleged omissions from the prospectuses. According to plaintiff, Ryan's scienter can be inferred from her alleged knowledge about the problems in Europe before the prospectuses were issued. The Court agrees. At this stage, Ryan's alleged knowledge that the prospectuses were materially incomplete is sufficient to satisfy the scienter element.

The claim against Rogers with respect to the European operations is also based solely on the alleged prospectus omissions. Plaintiff does not allege, however, that Rogers participated in the 2003 meetings in which the Former Senior European Finance Executive told Kelley and Ryan about the problems with Europe. But plaintiff does allege that during a conference call with Rogers, Kelley and Ryan that took place shortly after Kelley and Ryan's first meeting with the Former Executive, Rogers told the Former Executive that he had lowered the 2004 profit projection for Europe by fifteen percent. (*See* Compl. ¶¶ 99-105.) Plaintiff also alleges that Rogers attended the February 2004 summit meeting and that he, along with Kelley, said that Europe was "losing money" and "was bringing the Company down." (*Id.* ¶¶ 110, 113.) Taken together, those allegations are sufficient to enable a reasonable person to infer that Rogers acted with the requisite intent with respect to the alleged omissions about Europe in the prospectuses.

The situation is different for Schnall. Plaintiff does not allege any facts from which a reasonable person could infer that he knew the prospectus information about Europe was materially incomplete. But plaintiff says that his scienter can be inferred from the fact that he is one of the "principals" of and has a "financial and controlling interest[]" in CDR and, thus, had a financial motive to inflate the offering price. (Compl. ¶¶ 30, 175, 179, 181.)

28

The Court disagrees. Every shareholder in a company that decides to go public has a financial interest in obtaining a high offering price. Equating that interest with an intent to defraud would make all such shareholders targets of securities fraud claims. Consequently, the Court holds that Schnall's alleged financial interest in the offerings does not, by itself, give rise to a strong inference of scienter. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 420 (5th Cir. 2001) (allegations that officers and directors would benefit from higher public offering price held "insufficient to support a strong inference of scienter"); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l. Corp., N.V.*, 941 F. Supp. 1369, 1377 (S.D.N.Y. 1996) (allegations that defendant bank "was a founder, a substantial creditor, and a shareholder" of company whose notes were sold in the offering and, therefore, "had ample motive to inflate [the company's] financial soundness to ensure a successful and profitable offering" held inadequate to allege scienter). Accordingly, the Court dismisses the section 10(b) claim asserted against Schnall for misstatements about SIRVA Europe.

We turn now to the last individual defendant, Stocker. Plaintiff has not alleged any facts that suggest Stocker knew the prospectus information about Europe was materially incomplete, had any motive to defraud, or otherwise acted with the requisite intent with respect to the alleged omissions about Europe in the prospectuses. Therefore, the section 10(b) claim plaintiff asserts against him for those alleged omissions must be dismissed.

That leaves the two corporate defendants, SIRVA and CDR. The individual defendants' knowledge can be imputed to those entities but only if they obtained the knowledge when they were acting within the scope of their employment. *United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida County, Wis.*, 965 F.2d 311, 316 (7th Cir. 1992). Plaintiff alleges that Kelley and Ryan learned about the problems in Europe in the course of their duties as

29

SIRVA's CEO and CFO, respectively, and that Rogers learned about them while acting in his capacity as a principal of CDR. Accordingly, their knowledge can be imputed to SIRVA and CDR.

### B. Insurance Reserves

Plaintiff alleges that the SIRVA defendants made the following misrepresentations and omissions about insurance reserves in the prospectuses: (1) that SIRVA manipulated insurance reserves to boost earnings; (2) SIRVA's reserve rates are "based on a percentage of earned premium[, which, in turn,] is based on historical data, run rates and actuarial methods"; (3) reserves for cargo claims are analyzed quarterly and changes to them are made "as appropriate"; (4) reserves are "based upon past claims experience, knowledge of claims staff regarding the nature and potential cost of each claim and trends and estimates of future claims trends"; and (5) SIRVA improperly failed to take a timely charge to accrue additional liabilities to its multiple-line property and commercial liability insurance (Compl. ¶¶ 40, 44-45, 137, 153-70; Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 1, IPO Prospectus at 37, 77; *id.*, Ex. 8, SPO Prospectus at 28, 67.) In addition, plaintiff alleges that defendants made the following misrepresentations elsewhere:

(6) in a February 10, 2004 conference call, Kelley said that SIRVA's insurance business was growing in an "intelligent and low-risk manner" and operated on "very careful risk models" (Compl. ¶¶ 232, 235);

(7) in the 2003 Form 10-K, defendants said that SIRVA was "cautious in choosing which customers to insure and what kinds of insurance to write" and reported that SIRVA had reserves of $48.7 million and $53.7 million at the end of 2002 and 2003, respectively (*id.* ¶¶ 240, 243-44);

(8) in the Form 10-Q for the first quarter of 2004, defendants said that SIRVA had insurance reserves of $51.7 million and claims reserves of $19.6 million at the end of March 2004 (*id.* ¶ 262);

30

(9) in an April 27, 2004 conference call, Kelley said that more than two-thirds of the insurance unit's growth "came organically" (*id.* ¶ 254); and

(10) In an August 5, 2004 conference call, Kelley said that SIRVA was "growing th[e] [insurance] business without compromising [its] risk standards" (*id.* ¶ 292).

As noted above, the third alleged misrepresentation concerning reserves for cargo claims is not actionable because plaintiff alleges that SIRVA manipulated reserves for NAIT and workers' compensation claims only. (*See* Compl. ¶¶ 153-55, 162-63, 166-68.) Consequently, plaintiff cannot base a section 10(b) claim on prospectus statements about cargo claims reserves.

Plaintiff fares no better with its claim that defendants concealed alleged reserves manipulation. As discussed above, the manipulation claims are based on information from confidential informants whose identities and personal knowledge are not described with the detail demanded by the PSLRA.

Plaintiff's remaining reserves claims – (1) that defendants falsely described SIRVA's reserves methodology in the prospectuses; (2) that defendants improperly failed to take a timely charge to accrue additional liabilities related to certain lines of insurance; (3) that Kelley falsely characterized SIRVA's insurance business and its growth in the February 10, April 27 and August 5, 2004 conference calls; and (4) that defendants falsely characterized SIRVA's insurance business and the amount of its reserves in its 2003 Form 10-K and its Form 10-Q for the first quarter of 2004 – depend on the inadequately pleaded manipulation allegations. Thus, these claims must also be dismissed.

31

## C. Accounting Practices & Projections

That last group of misstatements that plaintiff attributes to the SIRVA defendants concerns

the company's accounting practices and financial projections. With respect to SIRVA's accounting

practices, plaintiff alleges that defendants:

> (1) put false financial information for the years 2001-2003 and the first three quarters of 2004 in the prospectuses, the February 10, 2004 press release, SIRVA's 2003 Form 10-K, the April 27, 2004 press release and conference call, SIRVA's Form 10-Qs for the first, second and third quarters of 2004, SIRVA's 2003 Annual Report, and the August 5, 2004 press release and conference call (Compl. ¶¶ 40-41, 43, 48-52, 57, 59, 63, 231, 236, 251, 256, 259, 273-74, 279, 286, 289, 291, 293, 318, 374, 376-80, 384, 386, 388);
>
> (2) gave false assurances that the financial statements fairly presented the company's financial results in the prospectuses, in SIRVA's 2003 Form 10-K, in SIRVA's Form 10-Qs for the first, second and third quarters of 2004 and in its 2003 Annual Report and Proxy (*id.* ¶¶ 41, 59, 63, 237-38, 259-60, 274, 277, 293-94, 318-19);
>
> (3) falsely stated the company's policy regarding revenue recognition in the prospectuses, SIRVA's 2003 Form 10-K, SIRVA's Form 10-Qs for the first, second and third quarters of 2004, the 2003 Annual Report and Proxy and the January 31, 2005 conference call (*id.* ¶¶ 46, 62-63, 241-42, 261, 276, 295, 320, 333);
>
> (4) falsely stated that the company had adequate internal accounting controls in the prospectuses, SIRVA's 2003 Form 10-K, SIRVA's Form 10-Qs for the first, second and third quarters of 2004 and its 2003 Annual Report and Proxy (*id.* ¶¶ 40, 52, 56, 63, 222, 237, 239, 263, 275, 296, 322, 398-99);
>
> (5) failed to disclose in the prospectuses changes defendants made in certain accounting methodologies (*id.* ¶¶ 52-53, 63); and
>
> (6) falsely stated that SIRVA's financial statements had been prepared in accordance with GAAP in the 2003 Annual Report and Proxy, the 2003 Form 10-K and the Form 10-Qs for the second and third quarters of 2004 (*id.* ¶¶ 237, 260, 274-75, 294, 319, 263).

Defendants do not argue that these statements were true or immaterial, but they say plaintiff's

allegations do not support the inference that any of them knew the statements were false.

32

With respect to the individual defendants' knowledge, plaintiff alleges, in essence, that they must have known about the accounting improprieties because they were actively involved in the company's management and/or their positions gave them access to all of SIRVA's financial information. *(See id.* ¶¶ 194-205, 219-27.) The fact that defendants were active managers does not, however, support the inference that they knew of the alleged accounting manipulations. *Fin. Acquisition,* 440 F.3d at 287 ("[O]fficers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded."). Nor does the fact that defendants, by virtue of their positions, had access to the accounting information. *City of Phila. v. Fleming Cos., Inc.,* 264 F.3d 1245, 1264 (10th Cir. 2001) ("[A]llegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate . . . ." (quotation omitted)). Rather, plaintiff must allege facts that support the inference that each defendant was actually aware, or had a duty to be aware, of the alleged improprieties.

Plaintiff has made the requisite allegations only as to Stocker and Ryan. Though plaintiff does not allege Ryan's responsibilities as SIRVA's CFO, it is reasonable to infer that one of them was to ensure that the company's financial statements were accurate. Moreover, plaintiff specifically alleges that Stocker and Ryan were members of the Audit Committee during the class period, a committee that was charged with:

> review[ing] the quality and integrity of SIRVA's financial reporting and other internal control processes, the quality and integrity of its financial statements, its compliance with legal and regulatory requirements and its code of conduct, the qualifications and independence of its auditors, the performance of its internal audit function and independent auditors and other significant financial matters.

33

(Compl. ¶¶ 219-20, 222, 226.) Further, because Ryan and Stocker are alleged to have learned of the accounting issues while acting in the scope of their employment with SIRVA, their knowledge can be imputed to the company. *One Parcel of Land,* 965 F.2d at 316. In sum, plaintiff's knowledge allegations are sufficient with respect to Ryan, Stocker and SIRVA but not with respect to Kelley, Schnall, Rogers or CDR.

Plaintiff also alleges that defendants made false earnings projections in the February 10, 2004 conference call, the April 27, 2004 press release and conference call and the August 5, 2004 press release and conference call. (Compl. ¶¶ 234, 253, 257, 288, 290-91.) Defendants contend that these projections are protected by the PSLRA's "safe harbor" for forward-looking statements. Forward-looking statements include "projection[s] of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items" and "statement[s] of future economic performance." 15 U.S.C. § 78u-5(i). Defendants are shielded from liability for such statements if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]" or "plaintiff fails to prove that the forward-looking statement[s] . . . w[ere] made with actual knowledge . . . that [they] w[ere] false or misleading." *Id.* § 78u-5(c)(1).

Defendants told investors both during the conference calls and in the press releases that the projections were forward-looking statements and directed them to the cautionary language in SIRVA's SEC filings, including the IPO prospectus and SIRVA's 2003 Form 10-K. (*See* Exs. SIRVA Defs.' Mem. Law Supp. Mot. Dismiss, Ex. 2, Tr. 2/10/04 Conference Call at 1; *id.*, Ex. 4, Tr. 4/27/04 Conference Call at 1; *id.*, Ex. 13, Tr. 8/5/04 Conference Call at 1; *id.*, Ex. 14, 2/10/94

34

Press Release at 3; *id.*, Ex. 15, 4/27/04 Press Release at 2-3; *id.*, Ex. 16, 8/5/04 Press Release at 2-3.)

The IPO prospectus sets forth twenty-three risk factors associated with SIRVA's business:

(1) If we do not successfully compete within the highly competitive industries in which we operate, our operating revenues and profitability could be adversely affected.

(2) Competition may force us to lower our prices thereby adversely affecting our operating revenues and profitability.

(3) Our business and financial condition could continue to be adversely affected by the present economic downturn and could also be affected by future economic downturns and other external events.

(4) Until recently, we had a history of net losses, and may not be profitable in the future.

(5) Our success depends in part on our relatively new and unproven strategy of offering a global comprehensive relocation solution to customers.

(6) Our global relocation solutions business exposes us to some of the risks of the real estate industry, including risks relating to the purchase, ownership and resale of transferred employees' homes at a loss.

(7) Our network services business exposes us to some of the risks of the insurance industry.

(8) We may not be able to recruit and retain a sufficient number of agents, representatives or owner/operators to carry out our growth plans.

(9) Actions taken by our agents may harm our brands or reputation, or result in legal action against us.

(10) Potential liability associated with accidents in the trucking industry is severe and occurrences are unpredictable. In addition, an increase in liability, property or casualty insurance premiums could cause us to incur significant costs.

(11) If we lost one or more of our government licenses or permits or became subject to more onerous government regulations, including the new federal safety rules on truck driver work hours, we could be adversely affected.

(12) We are subject to litigation or governmental investigations as a result of our operations.

(13) Contingent or future environmental liabilities could cause us to incur significant costs and adversely affect our operations.

(14) Our business is highly seasonal, which leads to fluctuations in our operating results and working capital needs.

(15) Our owner/operators are currently not considered to be employees by taxing and other regulatory authorities. Should these authorities change their position and consider our owner/operators to be our employees, our costs related to our tax, unemployment compensation and workers' compensation payments could increase significantly.

(16) The international scope of our business may adversely affect our business.

(17) We are exposed to currency fluctuations, which may have an adverse effect on us.

(18) Fuel is a significant cost element in the trucking transportation industry. Fuel prices are currently high and may continue to rise and they, and the availability of fuel, have been subject to volatility in the past.

(19) We are a holding company with no significant independent operations and therefore rely on our subsidiaries to make funds available to us.

(20) We have had substantial existing debt and may incur substantial debt in the future, and the agreements governing our debt contain restrictions that could significantly restrict our ability to operate our business.

(21) Any difficulties with our information systems or our information systems providers could delay or disrupt our ability to service our customers and impair our competitiveness.

(22) We are dependent on our highly trained executive officers and employees. Any difficulty in maintaining our current employees or in hiring similar employees would adversely affect our ability to operate our business.

(23) If we acquire any companies or technologies in the future, they could prove difficult to integrate, disrupt our business, dilute stockholder value or have an adverse effect on our results of operations.

36

(*Id.*, Ex. 1, IPO Prospectus at 13-19.) The cautionary language in the 2003 Form 10-K, which was filed nearly six months later, is virtually identical. (*See id.*, Ex. 9, 2003 Form 10-K at 12-20.) Plaintiff contends that those warnings are too general to be meaningful, as the PSLRA safe harbor requires.

Our court of appeals discussed the parameters of the safe harbor provision in *Asher v. Baxter International, Inc.*, 377 F.3d 727 (7th Cir. 2004). In that case, a group of investors sued Baxter under section 10(b) claiming that the earnings projections Baxter made for 2002 were false. *Id.* at 728. Baxter argued that the projections fell within the safe harbor because they were accompanied by the following cautionary language:

> Many factors could affect the company's actual results, causing results to differ materially, from those expressed in any such forward-looking statements. These factors include, but are not limited to, interest rates; technological advances in the medical field; economic conditions; demand and market acceptance risks for new and existing products, technologies and health care services; the impact of competitive products and pricing; manufacturing capacity; new plant start-ups; global regulatory, trade and tax policies; regulatory, legal or other developments relating to the company's Series A, AF, and AX dialyzers; continued price competition; product development risks, including technological difficulties; ability to enforce patents; actions of regulatory bodies and other government authorities; reimbursement policies of government agencies; commercialization factors; results of product testing; and other factors described elsewhere in this report or in the company's other filings with the Securities and Exchange Commission. Additionally, as discussed in Item 3 – "Legal Proceedings," upon the resolution of certain legal matters, the company may incur charges in excess of presently established reserves. Any such change could have a material adverse effect on the company's results of operations or cash flows in the period in which it is recorded.
>
> Currency fluctuations are also a significant variable for global companies, especially fluctuations in local currencies where hedging opportunities are unreasonably expensive or unavailable. If the United States dollar strengthens significantly against most foreign currencies, the company's ability to realize projected growth rates in its sales and net earnings outside the United States could be negatively impacted.

37

The company believes that its expectations with respect to forward-looking statements are based upon reasonable assumptions within the bounds of its knowledge of its business operations, but there can be no assurance that the actual results or performance of the company will conform to any future results or performance expressed or implied by such forward-looking statements.

*Id.* at 730. The district court agreed and granted Baxter's motion to dismiss. *Id.*

The investors appealed, arguing that Baxter could not take advantage of the safe harbor because the cautionary language was not meaningful. *Id.* In the Seventh Circuit's view, the word "meaningful" prohibits "boilerplate" warnings, such as "all businesses are risky." *Id.* at 732-33. Rather, a caution "must be tailored to the risks that accompany the particular projections." *Id.* at 732. Ultimately, the court concluded that a caution falls within the safe harbor "only if it includes those sources of variance that (at the time of the projection) were the principal or important risks." *Id.* at 734.

The court did not, however, make a determination on the meaningfulness of Baxter's cautionary language because such a decision was premature:

There is no reason to think – at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery – that the items mentioned in Baxter's cautionary language were those that at the time were the (or any of the) "important" sources of variance. The problem is not that what actually happened went unmentioned; issuers need not anticipate all sources of deviations from expectations. Rather, the problem is that there is no reason (on this record) to conclude that Baxter mentioned those sources of variance that (at the time of the projection) were the principal or important risks. For all we can tell, the major risks Baxter objectively faced when it made its forecasts were exactly those that, according to the complaint, came to pass, yet the cautionary statement mentioned none of them.

*Id.*

As in *Asher*, the cautionary language in this case lists a host of factors and events that might impact SIRVA's projections but not the ones plaintiff contends were most important. As the *Asher*

38

court explained, that omission is not necessarily fatal to defendants' quest for the safe harbor. But, given plaintiff's allegation that the missing information pertained to the "principal or important" risks at the time the projections were made, we cannot say, as a matter of law, that the cautionary language was meaningful.

All is not lost for defendants, however. Plaintiff must also allege that they had actual knowledge of the falsity of the projections, to defeat defendants' motion. As discussed above, plaintiff's allegations support the inference that Kelley, Ryan and Rogers knew the projections were false because of the problems in Europe. Moreover, because they obtained that information in the course of their duties for SIRVA and CDR, respectively, that knowledge can be imputed to the corporate defendants. *One Parcel of Land*, 965 F.2d at 316. Further, Rogers' alleged possession of material information about SIRVA Europe and his alleged ownership and control of CDR are sufficient to support the inference that CDR engaged in insider trading. Finally, as noted above, plaintiff's allegations support the inference that Ryan and Stocker, and therefore, SIRVA, knew the projections were false because of the accounting improprieties.

They do not, however, support the inference that: (1) Schnall or Stocker knew the projections were false because of the problems with Europe; (2) any of the defendants knew the projections were false because of manipulation of the insurance reserves; or (3) Kelley, Schnall, Rogers or CDR knew the projections were false because of improper accounting practices. Thus, the projections claim survives but only as to Kelley, Ryan, Rogers, SIRVA and CDR with respect to the problems in Europe and as to Ryan, Stocker and SIRVA with respect to the improper accounting practices.

## Counts III & V

In Count III, plaintiff asserts a claim under section 15 of the 1933 Act against Kelley, Ryan,

Schnall, Stocker and CDR. In Count V, plaintiff asserts a claim under section 20(a) of the 1934 Act

against the same defendants. Section 15 provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [section 11 of the 1933 Act], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o. Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder [*i.e.*, section 10(b)] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Though the two sections are not identical, the analysis applied to them is the

same. *See Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-13 (7th Cir. 1994)

(analyzing section 15 and section 20(a) claims together); *Barker v. Henderson, Franklin, Starnes &*

*Holt*, 797 F.2d 490, 494 (7th Cir. 1986) (noting that the two sections are "parallel").

Defendants contend that these counts must be dismissed because they cannot be held liable

both as primary violators, as charged in Counts I and IV, and as control persons. The statutory

language suggests that control person liability is an alternative to liability for a primary violation,

and some courts have interpreted it that way. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d

63, 77 (2d Cir. 2001) (stating that control person liability "is a separate inquiry from that of primary

liability and provides an alternative basis of culpability"). Only a few courts have addressed the issue, however, and the Seventh Circuit is not one of them. Thus, whether control person liability is an alternative or a supplement to primary liability is an open question in this circuit.

At some point, the Court may have to decide that question, but we need not do it now. Because plaintiff is permitted to plead alternatively, the Court would not dismiss Counts III and V even if liability cannot be imposed on defendants under both theories.

Defendants also say that these counts must be dismissed because plaintiff has not pleaded enough facts to demonstrate that they are control persons within the meaning of the statutes. Control person claims are not, however, subject to a heightened pleading standard. *See* FED. R. CIV. P. 9(b); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2004 WL 574665, at *16 (N.D. Ill. Mar. 22, 2004). Consequently, plaintiff's allegation that each defendant "had direct involvement in the day to day operations of [SIRVA] and/or control over major corporate decision and policy making, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same" (Compl. ¶ 461), is sufficient to satisfy the control element of the section 15 and 20(a) claims. *See Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992) (stating that a control person is one who "actually participated in, that is, exercised control over, the operations of the person in general and . . . possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.").

However, a control person is liable under sections 15 and 20(a), only if the person or entity that it controls is liable for violating sections 11 and 10(b), respectively. As discussed above,

41

plaintiff has adequately alleged that SIRVA violated both sections 11 and 10(b). Therefore, defendants' motions to dismiss Counts III and V are denied.

## Count VI

In Count VI, plaintiff asserts a claim under section 20A of the 1934 Act against CDR for insider trading. Defendants say this claim must be dismissed because liability under section 10(b) is a predicate to liability under this section. *See, e.g., Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2d Cir. 1994) ("[T]he language of the statute is . . . quite plain that to state a claim under § 20A, a plaintiff must plead a predicate violation of the [19]34 Act or its rules and regulations.") Even if that is true, an issue we do not decide, Count VI survives. As discussed above, plaintiff has successfully pleaded section 10(b) claims against CDR.

## III. Price

## Counts I and IV

Plaintiff alleges that Price violated sections 11 and 10(b) by falsely stating in its audit opinions[4] for SIRVA's 2000-2003 financial statements, which were included in SIRVA's 2003 Annual Report, 2003 Form 10-K, 2004 Form 10-K and both prospectuses, that: (1) the financial statements were prepared in accordance with GAAP; and (2) Price had audited those statements in accordance with Generally Accepted Auditing Standards ("GAAS"). (Compl. ¶¶ 95, 274, 280.)

---

[4]It is not clear whether plaintiff asserts a 10(b) claim against Price for its actuarial work. To the extent that it does, the claim must be dismissed because plaintiff does not allege that Price made any false statements in connection with that work.

42

Price says the section 11 claim must be dismissed because plaintiff has not alleged it with the particularity required by Rule 9(b). Plaintiff contends that such claims are not subject to that Rule, and both parties offer authority in support of their positions. We need not, however, decide whether the Rule applies because, even if it does, plaintiff's allegations pass muster.

Rule 9(b) requires plaintiff to allege the "who, what, when, where and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Plaintiff alleges that Price falsely stated in specifically identified documents that its audits conformed to GAAS and SIRVA's financials conformed to GAAP, and that Price knew or should have known, for the reasons discussed below, that those statements were false. Those allegations are sufficient to satisfy Rule 9(b). Accordingly, Price's motion to dismiss the section 11 claim asserted against it is denied.[5]

With respect to the section 10(b) claim, Price argues that plaintiff has not adequately alleged that it acted with scienter. "The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (quotation omitted). Rather, plaintiff must allege that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* (quotation omitted). Moreover, as discussed above, to satisfy

---

[5]In its reply brief, Price argues, for the first time, that plaintiff has no standing to pursue a section 11 claim with respect to the SPO and that even if it does, it has failed to allege damages that are traceable to that offering. (*See* Price Reply at 9-10.) To the extent that Price is arguing plaintiff lacks non-jurisdictional standing, Price has waived the argument by failing to raise it in its opening brief. *United States v. Turner*, 203 F.3d 1010, 1019 (7th Cir. 2000). To the extent that Price argues that plaintiff lacks Article III standing, that argument fails for the reasons discussed above.

43

the PSLRA, plaintiff must allege "sufficient facts to convince a court at the outset that the defendants likely intended to deceive, manipulate, or defraud." *Tellabs*, 437 F.3d. at 594-95 (quotations and citations omitted).

Plaintiff says that Price's intent can be inferred from its disregard of numerous "red flags," of fraud, including: (1) the pervasive and obvious deficiencies in SIRVA's internal controls; (2) SIRVA's use of, and lack of control over, manual entries; (3) SIRVA's unusual growth or profitability compared to other companies in the industry; (4) management's failure to follow up on issues, provide oversight and display an appropriate attitude toward control; (5) the lack of properly trained personnel responsible for ensuring accurate financial reporting; (6) management's domination by a single person or small group and its undue emphasis on aggressive earnings targets; (7) earnings increases that were due solely to changes in methodology; (8) SIRVA's flawed inter-company reconciliation process; (9) SIRVA's use of subjective or unsupported estimates about assumptions affecting the amount of assets, liabilities, revenues and expenses reported; and (10) SIRVA's understatement of its insurance reserves (Compl. ¶¶ 408-10, 413-14, 416-17, 419, 420-26, 428).

Plaintiff also alleges facts from which we can infer that Price actually knew, or should have known, about most of these issues. Plaintiff says that it is standard auditing practice to examine a company's internal controls before issuing an audit report, to question a company's unusual growth or profitability relative to its competitors and to scrutinize closely the use of manual journal entries and assumptions based on estimates. (*Id.* ¶¶ 413-14, 416, 427.) Plaintiff also says that Price should have realized that the statements did not accurately reflect insurance reserves because it served as

44

the actuary for those reserves.[6] (*Id.* ¶¶ 162-63, 428.) Moreover, it is reasonable to infer, given the extent of the alleged problems, that a competent auditor would have discovered, in the course of investigating the sufficiency of SIRVA's internal controls, that the company lacked the personnel necessary to ensure accurate financial reporting, certain earnings increases were due solely to methodology changes and SIRVA's inter-company reconciliation process was flawed. Taken together, these allegations are sufficient to suggest that Price made the false GAAP and GAAS representations with the intent to defraud or with reckless disregard as to their accuracy. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 21488087, at *7 (S.D.N.Y. 2003) (holding that scienter element was satisfied by allegations that auditor "had unlimited access to WorldCom's books and records . . . [and] an obligation to review and evaluate those records in order to form an opinion regarding WorldCom's financial statements[,] . . . . [and that] WorldCom's books and records contained no support for or documentation of the accounting treatment of significant merger reserves and line costs"); *In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *11 (N.D. Ill. Nov. 4, 1998) ("Plaintiffs allege not only violations of GAAP and GAAS, but that Deloitte deliberately ignored several red flags in the financial statements which would have exposed the fraud. . . . Thus, the allegations in the complaint, including the magnitude of the misstatements, the specific GAAP and GAAS violations and the 'red flags' together support an inference that Deloitte's audit amounted to no audit at all or an egregious refusal to see the

---

[6]Price argues that plaintiff's assertion of this argument is an impermissible attempt to amend its complaint through a brief. The Court disagrees. That Price should have suspected accounting irregularities when it discovered SIRVA was under-reserved is a reasonable inference from the allegations in the complaint.

obvious or investigate the doubtful." (quotation omitted)).[7] Price's motion to dismiss is, therefore, denied.

## Conclusion

For all of the reasons stated above:

(1) the Underwriters' motion to dismiss [doc. no. 83] is granted in part and denied in part. The motion is granted as to: (1) the Count I claims based on insurance reserves manipulation, which are dismissed without prejudice; (2) the Count I claims based on the prospectus statements that "We intend to increase our market share internationally"; "We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development"; and "We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia," which are dismissed with prejudice; and (3) the claims in Count II, which are dismissed without prejudice. In all other respects, the Underwriters' motion is denied.

(2) the SIRVA defendants' motions [doc. nos. 87 & 89] are granted in part and denied in part. The motion is granted as to: (1) the Count I claims based on insurance reserves manipulation, which are dismissed without prejudice; (2) the Count I claims based on the prospectus statements that "We intend to increase our market share internationally"; "We believe that the European and Asian market opportunities are considerable, as the markets are large and the corporate outsourcing trend is at an earlier stage of development"; and "We are approaching this international opportunity from a position of strength, with a leading market share position in Europe, Australia and Asia," which are dismissed with prejudice; (3) the claims in Count II, which are dismissed without prejudice; (4) the Count IV claims premised on: (a) the prospectus statements that SIRVA intended to increase its European market share, believed the opportunities there were considerable and was approaching them from a position of strength, which are dismissed with prejudice; (b) Ryan's statement in the February 10, 2004 conference call, which is dismissed with prejudice; (c) Kelley's statement in the April 27, 2004 press release that "[SIRVA] made significant progress in broadening [its] services offering and expanding [its] presence throughout the European continent," which is dismissed with prejudice; and (d) Kelley's statements in the August 4, 2004 press release that

---

[7]Price also argues that plaintiff's section 10(b) allegations do not satisfy Rule 9(b). For the reasons discussed above, the Court rejects this argument.

46

"We continue to invest in our European and Asia Pacific operations with the goal of developing a powerful selling and marketing capability across the rest of the world like we have in the U.S." and "We are building the infrastructure for future growth," which are dismissed with prejudice; (5) the Count IV claims asserted against defendants Schnall and Stocker that are premised on omissions from the prospectuses about SIRVA Europe, which are dismissed without prejudice; (6) all of the Count IV claims premised on alleged misstatements about the insurance reserves, which are dismissed without prejudice; (7) the Count IV claims premised on SIRVA's accounting practices that are asserted against Kelley, Rogers, Schnall and CDR, which are dismissed without prejudice; and (8) the Count IV claims premised on the alleged falsity of the financial projections: (a) due to undisclosed information about SIRVA Europe that are asserted against Schnall and Stocker; (b) due to undisclosed information about insurance reserves asserted against all of the SIRVA defendants; (c) due to undisclosed problems with SIRVA's accounting practices asserted against Kelley, Schnall, Rogers and CDR, all of which are dismissed without prejudice. In all other respects, the motions are denied.

(3) Price's motion to dismiss [doc. no. 86] is denied.

Plaintiff has thirty days from the date of this Memorandum Opinion and Order to amend its complaint in accordance with this Order. If no amendment is timely filed, the Court will dismiss the deficient claims with prejudice.

SO ORDERED.                    ENTERED:    9/22/06


HON. RONALD A. GUZMAN
United States District Judge

47